**COMMITTEE TO SAVE MOKELUMNE RIVER, a California non-profit corporation, Plaintiff–Appellee,**

v.

**EAST BAY MUNICIPAL UTILITY DISTRICT, a California Municipal Utility District, et al., Defendants–Appellants.**

No. 93–15999.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 1, 1993.

Decided Dec. 29, 1993.

Edward Berlin, Swidler & Berlin, Washington, DC, for defendant-appellant East Bay Mun. Utility Dist.

Sara J. Drake, Deputy Atty. Gen., Atty. General's Office, Sacramento, CA, for defendant-appellant California Water Quality Control Bd. Members, Central Valley Region.

Adria Y. LaRose, William S. Curtiss, Sierra Club Legal Defense Fund, Inc., Maria Savasta Kennedy, Michael W. Bien, Rosen, Bien & Asaro, San Francisco, CA, for plaintiff-appellee.

Before: REAVLEY,* PREGERSON, and FERNANDEZ, Circuit Judges.

PREGERSON, Circuit Judge:

The East Bay Municipal Utility District and the members of the California Regional Water Quality Control Board, Central Valley Region, defendants below, appeal the district court's order granting partial summary judgment in favor of the Committee to Save the Mokelumne River. The district court, in a well-written, well-reasoned opinion, found that defendants owned and operated the Penn Mine facility, and that the facility discharged pollutants into the Camanche Reservoir and Mokelumne River without a permit, in violation of the Clean Water Act, 33 U.S.C. §§ 1251–1376. On appeal, defendants contend that (1) Mine Run Dam, part of the Penn Mine facility, is not subject to the discharge permit requirements of the Clean Water Act; (2) the Water Board is immune from liability under the Act; and (3) summary judgment was improper because a triable issue of material fact exists whether there has been an "addition of pollutants" within the meaning of the Clean Water Act.

We have jurisdiction under 28 U.S.C. § 1292(b). We affirm.

## BACKGROUND

The Penn Mine property is the site of an abandoned copper and zinc mine that operated intermittently from the 1860s through the 1950s. The companies that mined the site left behind reactive mine tailings, waste rock, and excavated ores. When exposed to oxygen and water, these materials form "acid mine drainage," which contains high concentrations of aluminum, cadmium, copper, zinc, iron, and sulfuric acid. Unless impeded, rain water falling on the site carries this acid mine drainage downhill, in the form of surface runoff, into the Mokelumne River.

In the 1960s, the East Bay Municipal Utility District (the "District") acquired a portion of the Penn Mine property to build the Camanche Reservoir. The District owns water rights on the Mokelumne and supplies water to towns and cities east of San Francisco. In 1978, the District, joined by the California Regional Water Quality Control Board, Central Valley Region (the "Board"), constructed the Penn Mine Facility (the "facility") in an attempt to reduce the threat of continued toxic runoff from the site. The facility consists of Mine Run Dam and the Mine Run Dam Reservoir surface impoundment, along

---

* Hon. Thomas M. Reavley, United States Circuit Judge, U.S. Court of Appeals for the Fifth Circuit, sitting by designation.

with a series of other impoundments, drainage ditches, pipes, valves, culverts, and channels. The Mine Run Dam and most of the Mine Run Dam Reservoir are located on property owned by the District. A small portion of the Mine Run Dam Reservoir extends onto property owned by a defunct mining company.

The facility was designed to capture contaminated surface water flowing through the site, and to contain and evaporate the water through a ponding and recirculation system, preventing the contamination from reaching the reservoir and river below. Each of the two drainages once occupied by Hinkley Run and Mine Run creeks, which formerly flowed through the site, now contains a cascade of three impoundments. Water contaminated with toxic pollutants runs off the mine site and collects in the upper impoundments and then flows to the lower impoundments, eventually collecting in the Mine Run Dam Reservoir. A pump and pipe owned by the Board recirculates polluted water from Mine Run Dam Reservoir back into the upper impoundments located in the former Mine Run Creek drainage basin. Defendants operate that pump.

The facility also consists of two principal diversion ditches that divert the surface flows of Hinkley Run and Mine Run creeks around the abandoned mine site. Those diversion ditches are intended to isolate the facility from the unpolluted flows of these two creeks by diverting the streams around the facility and directly into the Mokelumne River and Camanche Reservoir, below.

As part of the facility's ongoing operation, various pipes, channels, and gullies carry polluted runoff from the mine tailings and dikes into the Mine Run Dam Reservoir and other facility impoundments. In addition, from time to time, water and drainage collected in the Mine Run Dam Reservoir have passed over the spillway or through the dam's discharge valve into the Mokelumne River and Camanche Reservoir.

The Clean Water Act (the "Act"), 33 U.S.C. §§ 1251–1376, is intended to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). In pursuit of this goal, the Act prohibits the "discharge of any pollutant" into navigable waters from any "point source" without a permit. See 33 U.S.C. § 1311(a) (except as otherwise provided in the Act, the discharge of any pollutant by any person shall by unlawful); § 1342(a) (authorizes EPA Administrator to permit some discharges of pollutants under a National Pollutant Discharge Elimination System ("NPDES")); § 1362(12) (defines "discharge of a pollutant" as "any addition of any pollutant to navigable waters from any point source").

The Committee to Save the Mokelumne River (the "Committee") initiated this suit against the District and members of the Board under the citizen suit provisions of the Act, 33 U.S.C. § 1365. The Committee seeks a judgment declaring that defendants have discharged pollutants from the Penn Mine facility without a permit, in violation of the Clean Water Act, and enjoining defendants from discharging pollutants from the facility until they have obtained an NPDES permit to do so. The Committee also seeks an order requiring defendants to devise a remedial plan to remove and dispose of contaminated sediment in the reservoir.

Defendants moved to dismiss this action on a number of procedural and substantive grounds. At the same time, the Committee moved for summary judgment on the issue of defendants' liability under the Act. The district court denied defendants' motion and granted judgment in favor of the Committee on the issue of liability.

On appeal from the district court's order of summary judgment in favor of the Committee, defendants raise four issues. They contend that the district court erred in granting partial summary judgment in favor of the Committee because (1) Mine Run Dam is not subject to the discharge permit requirements of the Clean Water Act; (2) a material issue of fact exists as to whether defendants have "discharged a pollutant" within the meaning of the Act; (3) defendants' activities in constructing and operating the facility are regulatory, and therefore cannot constitute "additions of pollutants" under the Act; (4) the Eleventh Amendment immunizes defendants

from liability under the Clean Water Act. We address each of these arguments in turn.

## DISCUSSION

### A. Is Mine Run Dam subject to the Clean Water Act's permit requirements?

To establish a violation of the Act's NPDES requirements, a plaintiff must prove that defendants (1) discharged, i.e., added (2) a pollutant (3) to navigable waters (4) from (5) a point source. *National Wildlife Federation v. Gorsuch*, 693 F.2d 156, 165 (D.C.Cir. 1982). Defendants concede that acid mine drainage is a "pollutant," that the Mokelumne River is among the covered "navigable waters," and that the spillway and valve of the Mine Run Dam and Reservoir are "point sources"[1] from which polluted water has entered the Mokelumne River. They contest only the issue whether they have "added" pollutants to the Mokelumne.

Defendants argue that under well-established case law, the Mine Run Dam is not subject to the Clean Water Act's permit requirements because it is a dam that "does no more than impound navigable waters and impede their flow in the Mokelumne River." In support of this contention, defendants rely on two decisions that held that the specific dams at issue in those cases were not subject to the discharge permit requirements because they did not "discharge pollutants," i.e., " 'add' pollutants from the outside world to" navigable water. *See National Wildlife Federation v. Consumers Power Co.*, 862 F.2d 580, 584 (6th Cir.1988); *Gorsuch*, 693 F.2d at 174–75. These cases are inapposite here because the Penn Mine facility *does* "discharge pollutants" as that term is defined by the Act and relevant regulations.

In both *Consumers Power Co.* and *Gorsuch*, plaintiffs sought to compel dam operators to comply with the discharge permit requirements of the Clean Water Act. In *Gorsuch*, plaintiffs argued that dam-induced water quality changes caused by the impoundment and release of water were a "discharge of pollutants" within the meaning of the Act.[2] 693 F.2d at 161. Plaintiffs in *Consumers Power Co.* argued that the destruction of aquatic life by a dam's turbines and the release downstream of the remains were a "discharge of pollutants" within the meaning of Act. In both cases, the court held that the dams at issue did not "discharge a pollutant" because the dams did not *add* pollutants "from the outside world." *Consumers Power Co.*, 862 F.2d at 584; *Gorsuch*, 693 F.2d at 174–75. Neither case categorically exempts all dams from the discharge permit requirements of the Clean Water Act.

This case clearly is distinguishable from *Gorsuch* and *Consumers Power Co.* because the Penn Mine facility does not pass pollution from one body of navigable water into another. Rather, the source of pollution added to the Mokelumne River is "surface runoff that is collected or channelled by" defendants from the abandoned mine site. Such surface runoff is expressly listed under the definition of "discharge of a pollutant" contained in the regulations. *See* 40 C.F.R. § 122.2 ("Discharge of a pollutant means ... additions of pollutants into waters of the United States from: surface runoff which is collected or channelled by man").

In this case, defendants have admitted that acid mine drainage from the abandoned mine site is channelled into the Penn Mine facility and collects in the Mine Run Dam Reservoir. District Answer ¶¶ 18, 24; Board Answer ¶¶ 18, 22. Defendants also admit that "water and drainage collected in Mine Run Dam Reservoir had, from time to time, passed over the spillway or through the valve into the Mokelumne River and Camanche Reservoir." District Answer ¶ 21. *See also* Board Answer ¶¶ 18, 21, 22. These admissions, in

---

1. The court in *Gorsuch* noted that the pipes and spillways of dams are "point sources" under the Act, and therefore subject to the Act's discharge permit requirements:

   The pipes or spillways through which water flows from the reservoir through the dam into the downstream river clearly fall within [the] definition [of a "point source"], and the EPA has required NPDES permits for the discharge of grease, oil, or trash through the outlet works of a dam.

   *Gorsuch*, 693 F.2d at 165 n. 22.

2. "Discharge of a pollutant" is defined as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12).

turn, conclusively establish that defendants "discharge a pollutant" from the Penn Mine facility within the meaning of the Clean Water Act, making them subject to the Act's permit requirements.

### B. Have defendants raised a genuine issue of material fact so as to preclude summary judgment for the Committee?

█ Defendants also argue that a material issue of fact exists as to whether there is an "addition of pollutants," making improper the district court's grant of summary judgment. Specifically, defendants rely on evidence that the acidity of water flowing into the Mokelumne River through the Penn Mine facility is not greater now than it was before the dam was constructed. In effect, defendants contend that they are liable under the Clean Water Act only if the facility produces a net increase in the acidity of the surface runoff compared to the acidity of the runoff before the facility was constructed.

This argument misapprehends the focus of the Clean Water Act. The Act does not impose liability only where a point source discharge creates a net increase in the level of pollution. Rather, the Act categorically prohibits any discharge of a pollutant from a point source without a permit. 33 U.S.C. §§ 1311(a), 1342(a); *Consumers Power Co.*, 862 F.2d at 582. Thus, the factual issue raised by defendants concerning the historical level of pollution compared to the current level of pollution is not material to the resolution of the Committee's claim, and therefore does not preclude summary judgment on the issue of liability.

Defendants have already admitted that acid mine drainage is channelled into and collects in the Penn Mine facility, and then is released over the Mine Run Dam's spillway or through its valve into the Camanche Reservoir and the Mokelumne River. Consequently, they have admitted to each of the elements needed to establish liability under the Clean Water Act. Defendants have (1) discharged a pollutant (i.e., collected and channeled surface runoff containing acid mine drainage into the reservoir and then added the polluted runoff); (2) into navigable waters (i.e., the Mokelumne); (3) from a

point source (i.e., the dam's spillway and valve); (4) without a discharge permit. *See Gorsuch*, 693 F.2d at 165. Because the statute does not require the Committee to show that a greater level of pollution enters the Mokelumne now than was the case before the Penn Mine facility was constructed, the district court properly granted judgment in the Committee's favor on the issue of liability.

### C. Are actions taken by regulatory authority to prevent or reduce discharges subject to the Clean Water Act's permit requirements?

█ Defendants also argue that "the State cannot be held liable [under the Clean Water Act] for the activities which it has performed pursuant to its regulatory responsibilities." Although they concede that no case has so held, they contend that analogous cases under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") *do* lend support to their argument.

As the district court pointed out, in the cases cited by defendants, the absence of governmental liability under CERCLA rests squarely on express statutory exemptions. *See* Order at 34–35 & n. 32 (citing 42 U.S.C. §§ 9607(a)(1) & (2), and 42 U.S.C. § 9601). The Clean Water Act contains no such exemption. Given the absence of *any* statutory authority to exempt the Board or District from liability under the Clean Water Act, the district court did not err in finding that defendants are liable under the Act.

### D. Does the Eleventh Amendment immunize the Water Board from liability under the Clean Water Act?

█ The Water Board argues that "the District Court could not consider the construction that took place prior to the filing of the lawsuit because of Eleventh Amendment considerations." However, the Committee seeks only prospective equitable relief, which is not barred by the Eleventh Amendment. *See Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 104–05, 104 S.Ct. 900, 910, 79 L.Ed.2d 67 (1984) (citing *Ex Parte Young*, 209 U.S. 123, 155–56, 28 S.Ct. 441, 452, 52 L.Ed. 714 (1908)). Furthermore,

none of the authorities cited by defendants prohibit the district court from considering defendants' past conduct as it relates to ongoing or future violations. Thus, defendants' Eleventh Amendment argument is without merit.

## CONCLUSION

We conclude that the district court properly granted summary judgment in favor of the Committee on the issue of defendants' liability under the Clean Water Act.

AFFIRMED.

FERNANDEZ, Circuit Judge, concurring:

I concur, but write separately because my position may be somewhat more narrowly based than the position of the majority.

As I understand it, the pollutants in question used to be carried into the Mokelumne River by Mine Run Creek and Hinkley Run Creek. The water from those creeks, and other water, ran across the tailings from the mines and became polluted. The creeks then carried that water to the river. The project has diverted those creeks so that they will stay clean and has captured polluted runoff so that it can be released in a more measured way. In other words, it seems that unregulated quantities of pollutants were flowing into the river and causing fish kills and the like long before EBMUD and the Board did anything at all. Those entities sought to eliminate the disasters caused by that unregulated flow and that is why the project was built. The result has been a significant improvement in the river's environment and a boon to aquatic life.

The majority appears to agree with appellee's position that the project is a point source in the sense that the Environmental Protection Agency could not determine that a NPDES permit was not required. I am not so sure. It seems to me that, given the history of this project, the EPA could properly have determined that this really is much more like the dams it dealt with in *National Wildlife Fed'n v. Consumers Power Co.*, 862 F.2d 580 (6th Cir.1988), and *National Wildlife Fed'n v. Gorsuch*, 693 F.2d 156 (D.C.Cir.

1982), than it is like the typical point source that truly does add pollution to navigable waters. *See* 33 U.S.C. § 1362(12). If it had, we would have shown that determination great deference.[1] *See Consumers Power*, 862 F.2d at 584–85. It did not. In fact, the information before the district court and before us indicates that the EPA considers the project to be a point source, which does require a permit containing numerous onerous conditions.

Appellants earnestly argue that the EPA's approach, and that of the appellee's, will not serve the long-term purpose of bettering the aquatic environment. They indicate that it takes no genius or epopt to see what the message will be. Do nothing! Let someone else take on the responsibility. Let the water degrade, let the fish die, but protect your pocketbook from vast and unnecessary expenditures. Do not try to bring some order out of environmental chaos. In short, appellants suggest that no Odysseus or Daedalus crafted the policy which we are now asked to follow. Perhaps they are correct; I suspect they are.

Nevertheless, we are not policymakers. We must simply apply the law. The majority opinion demonstrates *that* with great clarity.

Therefore, I concur.

---

**1.** One could even consider whether primary jurisdiction principles should be applied. *See United States v. General Dynamics Corp.*, 828 F.2d 1356, 1362–66 (9th Cir.1987).