**Warren REYNOLDS, et al., Plaintiffs,**

**v.**

**RICK'S MUSHROOM SERVICE, INC., et al., Defendants.**

**Civil Action No. 01–3773.**

United States District Court, E.D. Pennsylvania.

Feb. 24, 2003.

Joel R. Burcat, Kimberly A. Hummel, Kirkpatrick and Lockhart, LLP, Harrisburg, PA, for Plaintiffs.

William E. Howell, Jr., Kennett Square, PA, for Defendants.

## MEMORANDUM

RUFE, District Judge.

This is a citizens suit seeking to enforce provisions of the Clean Water Act, the Pennsylvania Clean Streams Law, and Pennsylvania common law. Presently before the Court is Plaintiffs' motion for partial summary judgment. For the reasons set forth below, Plaintiffs' motion is granted in part and denied in part.

## I. FACTUAL BACKGROUND

Plaintiffs in this case, Warren Reynolds, John Reynolds and Wilmington Trust

Company, as Trustee, own property located east of Penn Green Road in New Garden Township, Chester County, Pennsylvania. Located on this property is a 6½ acre pond that is fed by a stream called Trout Run. The Reynolds family has used this pond for fishing, swimming, and aesthetic enjoyment. Upstream of Plaintiffs' pond and adjacent to Plaintiffs' land is property owned by Defendant M.A.Y. Farm, Inc. Defendant Rick Mushroom's Service, Inc. ("Rick's") leases a portion of the M.A.Y. Farm, Inc. property, and Defendant Richard Masha directs the daily operations for Rick's.

Rick's is a business that stores and processes waste generated by the mushroom industry, commonly called "spent mushroom substrate," or "SMS." SMS is a waste material that remains after mushrooms have been grown and harvested, and consists mostly of manure. Ricks's does not grow mushrooms or any other crops; rather, it receives SMS from area mushroom growers, stores and processes the SMS, and then transports it off-site for disposal. Whatever SMS is not transported off-site is permitted to sit on the property for a year or more to allow certain constituents in the waste to leach out so that it can be sold as potting soil.

Rick's SMS storage area and processing area covers approximately 3½ acres, and it is uncovered. When rain falls on the piles of SMS, a black oil-like liquid ("wastewater") leaches from the piles. At the heart of this lawsuit are Plaintiffs' allegations that this wastewater drains into Trout Run, and then flows with the stream for about 400 feet before entering the pond on Plaintiffs' property.

Plaintiffs allege that in 1999, Rick's did not maintain any controls to stop the flow of SMS wastewater from reaching Trout Run or any of its tributaries. In September 1999, unusually heavy rains associated with Hurricane Floyd struck this area and caused a large volume of wastewater to flow from the SMS piles into Trout Run, and eventually into Plaintiffs' pond. Plaintiffs contend that heavy wastewater flows associated with Hurricane Floyd caused a massive fish kill in their pond, which they reported to the Chester County Conservation District (the "CCCD"), who in turn contacted the Pennsylvania Department of Environmental Protection ("PADEP").

In November 1999, PADEP conducted inspections of Rick's and issued a Notice of Violation to Defendant Masha for discharging pollutants into Trout Run without a permit. *See* Letter from PADEP to Mr. Rick Masha, dated Nov. 10, 1999, attached to Plaintiffs' Motion at Ex. 15 (hereinafter "NOV Letter"). Rather than requiring Rick's to obtain a permit, however, PADEP allowed Defendants to work with the U.S. Department of Agriculture's Natural Resources Conservation Service (the "DOA") to try to eliminate the wastewater discharge. *See id.*

The DOA provided engineering and financial assistance to Rick's for the design and construction of structural measures to control the flow of wastewater from the SMS piles based on a Conservation Plan (copy attached to Plaintiffs' Motion at Ex. 22) developed by DOA for Rick's more than two years earlier. In addition, the DOA developed a Mushroom Farm Environmental Management Plan for Rick's (copy attached to Plaintiffs' Motion at Ex. 24), which was based on guidelines established by PADEP in its Best Practices Mushroom Manual (copy attached to Plaintiffs' Motion at Ex. 6).

During the summer and fall of 2000, Defendants installed structures to collect

the SMS wastewater, including berms[1] around the SMS piles that direct wastewater flow into a concrete sedimentation basin where solid material can settle out. From this basin the wastewater flows into a larger lined impoundment. From the impoundment, the wastewater is pumped into a system of pipes leading to two adjoining fields, where it is sprayed onto the fields using an array of twelve spray guns. Plaintiffs allege that runoff from the spray fields flow into channels constructed by Defendants for the purpose of collecting the water and diverting it around the impoundment. These channels, Plaintiffs allege, discharge to the stream floodplain and into Trout Run. Plaintiffs also allege that the berms have leaked, resulting in discharge of wastewater to Trout Run.

On January 17, 2001, the CCCD collected a sample of the wastewater from the impoundment. An analysis of the sample revealed levels of ammonia and phosphates that Plaintiffs characterize as "high." On February 11, 2001, Plaintiffs engaged a consultant, EPSYS, to determine whether it was feasible to apply wastewater from Defendants' impoundment onto Plaintiffs' fields. EPSYS collected samples from the impoundment and the sedimentation basin, but concluded that applying the wastewater to Plaintiffs' fields could result in the degradation of streams and groundwater on Plaintiffs' farm because of high levels of ammonia, bacteria, and salts in the wastewater. On May 3, 2001, Plaintiffs provided Defendant Masha with a copy of the EPSYS report. A copy of the EPSYS report and an accompanying affidavit are attached to Plaintiffs' Motion at Ex. 9.

Plaintiffs next retained a second consultant, WIK Associates, Inc, ("WIK"), to monitor discharges from Rick's. WIK collected samples from the channel that receives runoff from the spray areas just prior to the channels' confluence with Trout Run on six occasions during the spring of 2001, and again in December 2001. In addition, WIK collected samples of wastewater discharge seeping through the SMS storage area berm on five occasions during the spring of 2001. Analysis of these samples revealed that the wastewater discharges at various times violated Pennsylvania water quality standards for ammonia, chloride, nitrate and nitrite, phosphorous, sulfate, dissolved solids, coliform bacteria, fecal coliform bacteria, copper, lead, nickel, zinc, oxygen levels, and Delaware standards for turbidity. A copy of the WIK report and an accompanying affidavit are attached to Plaintiffs' Motion at Ex. 14.

On May 18, 2001, Plaintiffs notified Defendants, PADEP and the U.S. Environmental Protection Agency ("EPA") in a 60–day Notice Letter that Defendants' continued discharge of pollutants violated federal and state environmental laws, and that Plaintiffs planned to sue. Neither EPA nor PADEP commenced an enforcement action within 60 days, and so Plaintiffs commenced the instant action on July 26, 2001. The Complaint pursues claims under the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq.* ("Clean Water Act") (Count 1); the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9607 (Count 2); the Pennsylvania Clean Streams Law, 35 P.S. § 691.1, *et seq* (Counts 3, 4, 5); the Hazardous Sites Cleanup Act, 35 Pa. Stat. Ann. § 6020.101, *et seq.* (Count 6); and common law claims of public nuisance (Count 7); private nuisance (Count 8); and trespass (Count 9). Jurisdiction in this Court is proper pursuant to 28 U.S.C. §§ 1331, 1367.

---

1. "Berms" are mounds or walls of earth.

Plaintiffs filed the instant summary judgment motion on June 24, 2002, and the case was randomly reassigned to the undersigned on July 10, 2002. Defendants failed to file a response in a timely fashion. *See* Local Rule 7.1(c). In fact, Defendants still had not filed any response by the time the Court held a status conference with counsel for all parties on August 13, 2002. Following that conference, the Court entered an August 16, 2002 Order stating any response to Plaintiffs' motion for summary judgment would not be considered because it would be untimely. *See* Doc. # 28 at ¶ 3. On February 7, 2003, Defendants filed a brief, three-paragraph response to Plaintiffs' motion.[2] *See* Doc. # 33. Consistent with the Court's August 16, 2002 Order, the Court will not consider Defendants' untimely response.

## II. *STANDARD OF REVIEW*

Defendants' failure to file a timely response to Plaintiffs' summary judgment motion does not alter the traditional summary judgment standard, although it requires that the Court account for the lack of a response in its analysis. The Tenth Circuit recently addressed a court's duty in these circumstances:

[A] party's failure to file a response to a summary judgment motion is not, by itself, a sufficient basis on which to enter judgment against the party. The district court must make the additional determination that judgment for the moving party is "appropriate" under Rule 56. Summary judgment is appropriate only if the moving party demonstrates that no genuine issue of material fact exists and that it is entitled to judgment

as a matter of law. By failing to file a response within the time specified by the local rule, the nonmoving party waives the right to respond to or to controvert the facts asserted in the summary judgment motion. The court should accept as true all material facts asserted and properly supported in the summary judgment motion. But only if those facts entitle the moving party to judgment as a matter of law should the court grant summary judgment.

*Reed v. Nellcor Puritan Bennett*, 312 F.3d 1190, 1195 (10th Cir.2002). *See also Anchorage Assoc. v. Virgin Islands Bd. of Tax Review*, 922 F.2d 168, 175–76 (3d Cir. 1990) (stating same approach).

## III. *DISCUSSION*

Plaintiffs move for summary judgment on their Clean Water Act (Count 1), Pennsylvania Clean Streams Law (Counts 3, 4, 5), Public Nuisance (Count 7), Private Nuisance (Count 8), and Trespass claims (Count 9). For the reasons explained below, summary judgment is granted as to Counts 1 and 5.

### A. Clean Water Act

The Clean Water Act is intended to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). In pursuit of this goal, the Act prohibits the "discharge of any pollutant" into navigable waters from any "point source" without a permit. *See* Clean Water Act § 301, 33 U.S.C. § 1311(a). Plaintiffs allege that Defendants are in violation of this provision because they are discharging waste-

---

2. This filing was probably prompted by a telephone call from court staff checking on the status of the case, and inquiring into Defendants' failure to respond to Plaintiffs' motion. Defendants failed to include with the response any memorandum of law, any evidence, or

any substantive argument; rather, the response merely states specific denials of wrongdoing. Accordingly, even if the Court did consider Defendants' response, it would not alter the outcome of today's decision.

water from their SMS piles into Trout Run. Plaintiffs are prosecuting this action pursuant to the Act's citizen suit provision. *See id.* at § 1365.

■ To establish liability under § 301 of the Clean Water Act, Plaintiffs must prove that Defendants (1) discharged, *i.e.*, added (2) a pollutant (3) to navigable waters (4) from a point source (5) without a National Pollution Discharge Elimination System ("NPDES") permit. *See Comm. to Save Mokelumne River v. East Bay Mun. Util. Dist.,* 13 F.3d 305, 308 (9th Cir.1993), *cert. denied,* 513 U.S. 873, 115 S.Ct. 198, 130 L.Ed.2d 130 (1994); *Nat'l Wildlife Fed. v. Gorsuch,* 693 F.2d 156, 165 (D.C.Cir.1982). Defendants concede that Trout Run is a navigable water, *see* Defendants' Answer ¶ 21, and that they do not have a NPDES permit, *see* Defendants' Answers to Plaintiffs' First Request for Admissions at ¶ 43 (hereinafter "Answers to RFA"). Accordingly, the Court will limit its discussion below to elements one, two and four.

■ The Court will first address elements one and two, *i.e.*, whether Plaintiffs have presented sufficient evidence to demonstrate that the wastewater flows from the SMS piles constituted a "discharge" of a "pollutant," and that the discharge actually entered Trout Run. 33 U.S.C. § 1311. The evidence before the Court compels it to answer these questions in the affirmative.

■ It should be noted from the outset that whether a point source discharge creates a net increase in the level of pollution is irrelevant to the liability issue in this case. "Rather, the Act categorically prohibits any discharge of a pollutant from a point source without a permit." *Comm. to Save Mokelumne River,* 13 F.3d at 309. The Clean Water Act defines the term "pollutant" as:

dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water....

33 U.S.C. § 1362(6). This broad definition contains some exclusions, none of which apply here. *See id.*

Plaintiffs present ample evidence to support their contention that the wastewater flowing from the Defendants' SMS piles is a "pollutant." Defendants do not dispute that rain falling on the SMS piles produces a "wastewater runoff" that is "blackish-brown" and "looks like oil." *See* Defendants' Answers to Plaintiffs' First Set of Interrogatories at ¶ 1, subpar. 14 (hereinafter "Interr. Answers"); Deposition of Richard Andrew Masha at 92:19 to 93:6 (hereinafter "Masha Dep."). When the PADEP tested the wastewater in March 2000, which it described as "brown foamy" runoff, it concluded that the wastewater was "extremely polluted." NOV Letter.

In February 2001, after construction of the sedimentation basin and the lined impoundment was completed, EPSYS, a consultant retained by Plaintiffs, collected samples of wastewater located on Defendants' property. EPSYS concluded that the wastewater contained high levels of "ammonia, total dissolved solids, and other pollutants," and that the wastewater found in channels discharging from Defendants' property into Trout Run contained contaminants in excess of state and federal water quality standards and criteria. Affidavit of Timothy J. Miller at ¶¶ 20, 30, attached to Plaintiffs' Motion at Ex. 9 (hereinafter "Miller Aff.").

A second consultant retained by Plaintiffs, WIK, took wastewater samples from the channels located on Defendants' prop-

erty that discharge into Trout Run, as well as from wastewater that was seeping through the protective berms along the SMS storage area. WIK took these samples in March, April, May, and December 2001, *i.e.*, after construction of the sedimentation basin and the lined impoundment was completed. *See* Affidavit of Stephan A. Johnson at ¶ 8(d), attached to Plaintiffs' Motion at Ex. 14 (hereinafter "Johnson Aff."). After reviewing an analysis of these samples, WIK concluded that the wastewater entering Trout Run from Defendants' property exceeded Pennsylvania water quality standards at various times for ammonia, chloride, nitrate and nitrite, phosphorous, sulfate, dissolved solids, total coliform bacteria, fecal coliform bacteria, copper, lead, nickel, and zinc. *See id.* at ¶ 12(a)-(*l*). In addition, WIK concluded that the wastewater contained oxygen-demanding substances that caused dissolved oxygen levels in Trout Run to fall below Pennsylvania water quality standards, and that it contained turbidity-causing substances that caused Trout Run to exceed turbidity limits established by the Delaware River Basin Commission for White Clay Creek, a stream fed by Trout Run. *Id.* at ¶ 12(m)-(n). WIK concluded that these discharges are pollutants under the Clean Water Act. *Id.* at ¶ 11.

This evidence adequately supports Plaintiffs' contention that the wastewater located on and flowing from Defendants' property is a "pollutant" as that term is defined in the Clean Water Act. By way of further support, the Court notes that at least one court in this district has previously concluded that runoff from piles of mushroom compost is a "pollutant." *See United States v. Frezzo Bros., Inc.,* 461 F.Supp. 266, 269–70 (E.D.Pa.1978) (holding testimony from scientists demonstrated discharges were "sewage" and "biological

materials," thus meeting definition of "pollutant"), *aff'd,* 602 F.2d 1123 (3d Cir.1979), *cert. denied,* 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980).

In their responses to some of Plaintiffs' discovery requests, Defendants take the position that the SMS wastewater runoff from the spray fields never actually flowed into Trout Run because it was absorbed by vegetation boundaries implemented by Defendants. *See* Answers to RFA at ¶¶ 14–16. However, the record evidence presented to the Court contains no support for this contention. Indeed, the record provides every indication to the contrary.

For example, before construction of the sprayer system, PADEP noted that the wastewater runoff was leaving Defendants' property and entering Trout Run. *See* NOV Letter. ("[Defendants'] site and neighboring property are used for the storage of spent mushroom compost, in order to weather the material prior to removal for use as a soil conditioner. The run off generated from this material during rain events flows through a sedimentation basin and into a tributary to Trout Run."). After construction of the sprayer system, EPSYS observed the flow of wastewater from the spray fields. It reported that the wastewater drains into channels which have been constructed to divert flow around the wastewater impoundment, flows a short distance into channels that have eroded in the floodplain of Trout Run, and then discharges directly into Trout Run. Miller Aff. at ¶¶ 22, 25, 26, 27, 28, 29. WIK made the same observations. Johnson Aff. at ¶ 8(d), App. A. at p. 6 ("SMS-laden discharge has been observed traveling from [Ricks'], through the channels, and ultimately into Trout Run.").[3] Surface runoff such as that ob-

---

**3.** Additionally, there is evidence to support

Plaintiffs' contention that Rick's is the only

served here is expressly listed under EPA's regulatory definition of "discharge of a pollutant." *See* 40 C.F.R. § 122.2 ("Discharge of a pollutant means ... additions of pollutants into waters of the United States from: surface runoff which is collected or channelled [sic] by man."). This evidence is more than adequate support for finding that the wastewater runoff is a "discharge" under the Clean Water Act, and the Court notes the absence of any evidence to the contrary that might create a triable issue of material fact.

In sum, while the Court is required to give Defendants, as the nonmoving party on summary judgment, the benefit of all reasonable inferences, *Wetzel v. Tucker*, 139 F.3d 380, 383 n. 2 (3d Cir.1998), Defendants "may not rest upon the mere allegations or denials of [their] pleading." Fed. R.Civ.P. 56(e). In order to avoid summary judgment, Defendants must set forth evidence that points to "specific facts showing that there is a genuine issue for trial." *Id.* Defendants, having waived their right to controvert the facts set forth by Plaintiffs, have not and cannot do so here. Therefore, the Court finds that the evidence adequately supports Plaintiffs' contention that the wastewater runoff from Defendants' property constitutes "pollution," and that such "pollution" was discharged into Trout Run.

■ The next question presented relates to element four above, *i.e.,* whether Defendants are discharging the wastewater from a "point source." The Clean Water Act defines a "point source" as:

any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged. This term does not include agricultural stormwater discharges and return flows from irrigated agriculture.[4]

33 U.S.C. § 1362. As the Third Circuit has noted, "Congress intended a broad definition of 'point source:' 'The concept of a point source was designed to further this scheme by embracing the broadest possible definition of any identifiable conveyance from which pollutants might enter the waters of the United States.'" *United States v. West Indies Transp., Inc.,* 127 F.3d 299, 300 (3d Cir.1997) (quoting *United States v. Earth Sciences, Inc.,* 599 F.2d 368, 373 (10th Cir.1979)), *cert. denied,* 522 U.S. 1052, 118 S.Ct. 700, 139 L.Ed.2d 644 (1998). In discussing the meaning of "point source," the Tenth Circuit has opined that "it contravenes the intent of the [Clean Water Act] and the structure of the statute to exempt from regulation any activity that emits pollution from an identifiable point." *United States v. Earth Sciences, Inc.,* 599 F.2d 368, 373 (10th Cir. 1979).

In *Earth Sciences,* the Tenth Circuit examined a system specifically designed to

---

active waste processing facility upstream of Plaintiffs' property, thus foreclosing the inference that the pollution entering Trout Run is attributable to another source. *See* Johnson Aff. at ¶ 8(a).

4. Defendants' wastewater runoff does not fit within the exclusion for "agricultural stormwater discharges and return flows from irrigated agriculture." 33 U.S.C. § 1362. Defendants concede that they do not grow mushrooms, nor is there any evidence that

Defendants conduct agricultural activities. *See* Interr. Answers at ¶ 4. Furthermore, at least one court in this district has concluded that mushroom composting operations, which are substantially similar to Defendants' operation, is not an "agricultural activity." *See United States v. Frezzo Bros., Inc.,* 546 F.Supp. 713, 721–24 (E.D.Pa.1982) ("We find that the composting process is more akin to manufacturing than agriculture.").

prevent polluted runoff from entering an adjacent creek. *See id.* at 370. The defendant in that case operated a gold leaching operation where a toxic solution containing cyanide was sprayed over a 3 1/2–to–4 acre pile of gold ore to aid in separating the gold from the ore. The toxic solution leached down through the gold ore and collected beneath the pile on a plastic liner, where it drained into a sump, and then was pumped into a processing trailer, before being sprayed back onto the pile. The system of sprayers, pumps, and sumps was intended to be a closed, circulating system that would not result in any discharge of the toxic solution. *See id.*

When this system overflowed due to heavy snow melt, the toxic solution was discharged into the nearby creek on several occasions. *See id.* The court stated that it had "no problem finding a point source here." *Id.* at 374. First, it stated that it viewed "the combination of sumps, ditches, hoses and pumps . . . as a closed circulating system *to serve the gold extraction process with no discharge." Id.* (emphasis added). The court continued:

> When [the system] fails because of flaws in the construction or inadequate size to handle the fluids utilized, with resulting discharge, whether from a fissure in the dirt berm or overflow of a wall, the escape of liquid from the confined system is from a point source. Although the source of the excess liquid is rainfall or snow melt, this is not the kind of general runoff considered to be from nonpoint sources under the [Clean Water Act].

*Id.* The Court finds it significant that the Tenth Circuit in *Earth Sciences* viewed the system as a whole to be a "point source." The Court is of the opinion that this approach best effectuates the purposes of the Clean Water Act, and will utilize the same approach here.

Like in *Earth Sciences,* Defendants in this case utilize a system designed to prevent the discharge of pollutants. This system was designed in conjunction with state authorities, and consists primarily of land gradations, berms around the SMS, the sedimentation basin, the wastewater impoundment, and the sprayer system. It is designed to channel the wastewater from Defendants' property, collect the wastewater, and ultimately to irrigate grass fields without releasing the pollutants into Trout Run or any other waters. While utilizing the wastewater as a source of nutrients, the grass fields serve the purpose of filtering the pollutants from the wastewater. *See* Management Plan at p. 2 ("A hay field will then be established to assist in filtering the nutrients from the sprayed effluent.").

Yet, if this system breaks down, such as it apparently did when Plaintiffs' expert observed leaks in the berms, or when the system is used improperly, it can and has resulted in a discharge of polluted wastewater into Trout Run. *See* discussion *supra; see also* Best Practices Mushroom Manual at p. 25 ("Applying SMS or wastewater in excess, at the wrong time, or improperly handling it in other ways, releases the nutrients into the air and water."). The Court concludes that Defendants' operation is clearly the kind of system that Congress intended to include within the definition of "point source."

The Court's conclusion is in concert with EPA's interpretation of "point source" in an analogous setting. "Concentrated animal feeding operations" or CAFOs are expressly included in the definition of "point source." 33 U.S.C. § 1362. Defendants' system of wastewater collection and spraying is very similar to systems implemented at CAFOs, where the operators often spray wastewater and manure onto grass fields, a practice sometimes called "land

application." *See, e.g., Concerned Area Residents for the Environment v. Southview Farm*, 34 F.3d 114, 115–16 (2d Cir. 1994) (explaining CAFO system that utilizes storage lagoons and land application of liquid cow manure) (holding CAFO is a point source).

EPA recently adopted a rule that requires that CAFOs obtain an NPDES permit for any discharges resulting from land application of wastewater. *See* 68 Fed. Reg. 7176, 7196 (Feb. 12, 2003) (relevant portion to be codified at 40 C.F.R. § 122.23(e)) ("Today's rule clarifies that runoff from the application of CAFO manure, litter, or process wastewaters to land that is under the control of a CAFO is a discharge from the CAFO and subject to NPDES permit requirements."). EPA reasoned that the system of pipes and applicators are integral parts of the CAFO, and thus should be included within the definition of "point source." *See id.*

The Court finds EPA's reasoning applicable to Defendants' facility, and believes it supports the conclusion that the wastewater discharges in the instant matter are from a "point source." Moreover, analogous case law supports the Court's decision. *See, e.g., Sierra Club v. Abston Constr. Co.*, 620 F.2d 41, 45–46 (5th Cir. 1980) ("Gravity flow, resulting in a discharge into a navigable body of water, may be a part of a point source discharge if the miner at least initially collected or channeled the water and other materials.") (finding liability may exist where human efforts "are reasonably likely to be the means · by which the pollutants are ultimately deposited into a navigable body of water."); *United States v. Oxford Royal Mushroom Prods.*, 487 F.Supp. 852, 854 (E.D.Pa.1980) (finding discharge resulting from spraying overabundance of water onto irrigation fields, which, in turn, ran off into a nearby stream through a break

in a berm around the field may constitute discharge from a point source).

Having concluded that Plaintiffs have presented adequate evidence to support a finding that Defendants discharged a pollutant into navigable waters from a point source without a NPDES permit, and finding no disputed issues of material fact, the Court holds that Defendants have violated the Clean Water Act, *see* 33 U.S.C. § 1311(a), and summary judgment is appropriate as to Count 1 of the Complaint.

**B. Pennsylvania Clean Streams Law**

Plaintiffs pursue multiple claims under the Pennsylvania Clean Streams Law ("PCSL"), 35 P.S. § 691.1 *et seq.* They allege violations of § 201, 35 P.S. § 691.201 (Count 3); § 301, 35 P.S. § 691.301 (Count 4); and § 401, 35 P.S. § 691.401 (Count 5). The elements of these claims are substantially similar to the elements of a claim under § 301 of the Clean Water Act, and present many of the same issues.

Addressing Count 5 first, PCSL § 401 prohibits any person from placing into the waters of the Commonwealth any substance of any kind or character resulting in pollution. *See* 35 P.S. § 691.401. Regulations promulgated pursuant to the PCSL provide that "[a] person may not discharge pollutants from a point source into surface waters except as authorized under an NPDES permit." 25 Pa.Code § 92.3 (2002). These legal requirements are nearly identical to § 301 of the Clean Water Act. As discussed above in part III.A, Defendants concede that they do not have a NPDES permit. They also concede that Trout Run is "surface waters" under this section. Answers to RFA ¶ 46. Accordingly, as with its discussion *supra* at Part III.A, the Court must only determine whether Defendants discharged pollutants from a point source.

Unlike the Clean Water Act, the PCSL does not define the term "pollutant." The regulatory definition, however, provides that a pollutant is "[a]ny contaminant or other alteration of the physical, chemical, biological or radiological integrity of surface water which causes or has the potential to cause pollution as defined in section 1 of the [PCSL] (35 P.S. § 691.1)." 25 Pa.Code § 92.1. The PCSL defines "pollution" as contamination of water that makes it harmful or injurious to public health, including by contamination that alters its physical, chemical or biological properties. *See* 35 P.S. § 691.1. Based on the evidence discussed *supra* at Part III.A, the Court does not hesitate in finding that the Plaintiffs have demonstrated that Defendants discharged a "pollutant" as that term is defined for purposes of § 401 of the PCSL.

The Court has already concluded that Defendants' discharge emanated from a "point source." *See* discussion, *supra*, at III.A. Accordingly, the Court finds that Plaintiffs have satisfied their burden in showing that Defendants violated § 401 of the PCSL, and summary judgment is appropriate as to Count 5. *Cf. Commonwealth v. Toro Dev. Co.*, 2 Pa.Cmwlth. 429 (1971) (finding allegations sufficient under PCSL § 401 where plaintiffs alleged runoff from dirt piles discharged into waters); *Commonwealth v. Shippensburg Borough*, 2 Pa. D. & C.3d 417 (Pa.Comm.Pls.1977) (affirming summary conviction for violation of PCSL § 401 where cement entered creek during repairs to bridge, killing fish).

██ Turning to Counts 3 and 4 under the PCSL, sections 201 and 301 prohibit the discharge into waters of "sewage" and "industrial wastes," respectively. 35 P.S. §§ 691.201, 691.301. "Sewage" is defined

"to include any substance that contains any of the waste products or excrementious or other discharge from the bodies of human beings or animals." *Id.* at § 691.1. "Industrial Waste" is defined as:

> any liquid, gaseous, radioactive, solid or other substance, not sewage, resulting from any manufacturing or industry, or from any establishment, as herein defined, and mine drainage, refuse, silt, coal mine solids, rock, debris, dirt and clay from coal mines, coal collieries, breakers or other coal processing operations. "Industrial waste" shall include all such substances whether or not generally characterized as waste.

*Id.* Plaintiffs have submitted with their motion several examples of permits issued by PADEP to mushroom composting facilities, and regulating mushroom compost and SMS as sewage or as industrial waste. *See* Exs. 17–21. However, Plaintiffs point to no other evidence to demonstrate that Defendants' wastewater satisfies the above definitions. Accordingly, Plaintiffs' evidence is an insufficient basis upon which the Court can reasonably conclude that the runoff from Defendants' property is "sewage" and "industrial waste" as those terms are defined in the PCSL.[5] Merely because PADEP has chosen to take certain regulatory actions in similar settings establishes nothing as to the contents of Defendants' wastewater discharge *in this case*. Accordingly, Plaintiffs have failed to meet their burden, and summary judgment as to Counts 3 and 4 is denied.

## C. Common Law Claims

██ Finally, Plaintiffs move for summary judgment as to Count 7 (public nuisance), Count 8 (private nuisance), and Count 9 (trespass). Pennsylvania courts

---

5. Curiously, Plaintiffs take the position that the wastewater is "sewage," but insist that it is also "industrial waste," even though the definition of the latter excludes "sewage." *See* 35 P.S. § 691.1. The Court need not address this apparent contradiction here.

look to the Restatement (Second) of Torts § 821(B) to guide its determinations as to whether a property use constitutes a public nuisance: "A public nuisance is an unreasonable interference with a right common to the public." *Machipongo Land & Coal Co. v. Dep't of Envtl. Protection*, 569 Pa. 3, 799 A.2d 751, 773 (2002), *cert. denied*, —— U.S. ——, 123 S.Ct. 486, 154 L.Ed.2d 397 (2002). Whether there is a public right is a question of law, but whether an interference is unreasonable is a question of fact. *Id.* Pennsylvania courts also follow the Restatement for claims of private nuisance, which is defined as a "nontrespassory invasion of another's interest in the private use and enjoyment of land." *Golen v. Union Corp.*, 718 A.2d 298, 300 (Pa.Commw.Ct.1998) (quoting 4 Restatement Torts 2d, § 821D). Finally, "trespass" is defined in Pennsylvania as an unprivileged, intentional intrusion upon land in possession of another. *Graham Oil Co. v. BP Oil Co.*, 885 F.Supp. 716, 725 (W.D.Pa.1994).

█ Plaintiffs have failed to meet their burden to show that summary judgment is appropriate on these claims because they present too little argument and case law in their motion and supporting memorandum. *See Reed*, 312 F.3d at 1195 ("Summary judgment is appropriate only if the moving party demonstrates that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law."). For example, Plaintiffs have failed to demonstrate that Defendants' wastewater runoff created an "unreasonable interference" as a matter of law; nor have Plaintiffs set forth adequate argument on why these facts evidence a private nuisance; nor have Plaintiffs cited analogous case law supporting their contention that a trespass occurred in this case. *Cf. Power Co. of Am. v. FERC*, 245 F.3d 839, 845 (D.C.Cir. 2001) ("It is not the court's role to fill in

the blanks in counsel's argument."). Accordingly, the Court will deny Plaintiffs' motion as to Counts 7, 8, and 9.

An appropriate Order follows.

### ORDER

AND NOW, this 24th day of February, 2003, upon consideration of Plaintiffs' Motion for Summary Judgment [Doc. # 18], and for the reasons set forth in the attached Memorandum, it is hereby ORDERED that Plaintiffs' Motion is GRANTED IN PART and DENIED IN PART. It is further ORDERED:

1. Judgment as to liability under Count 1 and Count 5 of the Amended Complaint is hereby entered in favor of Plaintiffs and against Defendants;

2. Plaintiffs' Motion is DENIED as to all other Counts in the Amended Complaint.

It is so ORDERED.