**ENVIRONMENTAL PROTECTION INFORMATION CENTER, a nonprofit corporation, Plaintiff,**

v.

**PACIFIC LUMBER COMPANY, a Delaware corporation; Scotia Pacific Company LLC, a Delaware corporation; Environmental Protection Agency; and Christine Todd Whitman, Defendants.**

No. C 01–2821 MHP.

United States District Court,
N.D. California.

Jan. 8, 2007.

Michael R. Lozeau, Law Office of Michael R. Lozeau, Alameda, CA, Deborah A. Sivas, Stanford Law School, Stanford, CA, Sharon Eileen Duggan, Law Offices of Sharon E. Duggan, Oakland, CA, for Plaintiff.

Bruce Stewart Flushman, Stoel Rives LLP, Christopher J. Carr, Edgar B. Washburn, Shaye Diveley, Morrison & Foerster LLP, Mark A. Rigau, U.S. Dept of Justice, Environmental & Natural Resources Div., San Francisco, CA, Frank Shaw Bacik, John A. Behnke, Carter Behnke Oglesby & Bacik, Ukiah, CA, J. Michael Klise, Crowell & Moring LLP, Washington, DC, for Defendants.

### MEMORANDUM & ORDER

### Re: Parties' Cross–Motions for Summary Judgment

PATEL, District Judge.

On July 24, 2001 plaintiff Environmental Protection Information Center ("EPIC"), a non-profit environmental organization, brought a citizen-suit action under section 505(a) of the Clean Water Act ("CWA"), 33 U.S.C. section 1365(a), against Pacific Lumber Company and Scotia Pacific Company (collectively "PALCO"), the Environmental Protection Agency ("EPA"), and Christine Todd Whitman as EPA Administrator.[1]

Now before the court are PALCO's motion for summary judgment on the issue of

---

1. Pursuant to Federal Rule of Civil Procedure 25(d)(1), Michael Leavitt, new Administrator of EPA, automatically replaces his predecessor in this suit. *See* Fed.R.Civ.P. 25(d)(1).

EPIC's standing and EPIC's motion for partial summary judgment regarding its first and second claims for relief.[2] The court has considered the parties' arguments fully, and for the reasons set forth below, the court rules as follows.

## BACKGROUND

### I. Background Facts

In each of its prior decisions the court has set forth the underlying facts of this action in significant detail, and it is not necessary to restate that background here in order to resolve the motions currently before the court. The court, rather, need only reframe the core dispute.

At the heart of this litigation is Bear Creek, a brook situated several miles upstream of Scotia, California. A tributary of the Eel River, Bear Creek creates a watershed that covers 5500 acres of land throughout Humboldt County, California. Pacific Lumber Company and its wholly-owned subsidiary, defendant Scotia Pacific Lumber Company, own some ninety-five percent of the land in the Bear Creek watershed, much of which PALCO uses for logging.[3]

According to EPIC, substantial logging activity (primarily PALCO's) in the watershed area has spurred a dramatic increase in the amount of sediment deposited in Bear Creek. Before significant logging began, EPIC claims, Bear Creek's sediment deposit peaked at approximately 8,000 tons per year; after logging practices commenced, sediment deposit climbed to 27,000 tons per year. This sediment increase, EPIC alleges, has a specific source: PALCO's timber harvest-ing and construction of unpaved roads. According to EPIC, PALCO's logging activity increases sediment through the following process. First, EPIC notes, timber harvesting removes vegetation from the ground surface, making soil more susceptible to erosion and landslides. Construction of unpaved roads then exposes more soil, which, in turn, further destabilizes slopes. The effect of timber harvesting and road construction, EPIC contends, is to expose far more destabilized soil than is environmentally sustainable. When it rains, EPIC explains, the rain water carries the exposed silts and sediments—as well as other pollutants, such as pesticides and diesel fuel—into culverts, ditches, erosion gullies, and other alleged channels. From these various channels, silts, sediments and pollutants flow directly into Bear Creek. The consequences of PALCO's drainage system, EPIC notes, are predictable and environmentally adverse; PALCO's present and future timber harvest plans, EPIC adds, promise only to make the situation worse.

EPIC believes PALCO's present drainage system violates various provisions of the Clean Water Act, including (but not necessarily limited to) the National Pollutant Discharge Elimination System ("NPDES"). *See* 33 U.S.C. §§ 1251(a), 1311(a), 1342(a); *see also Environmental Def. Ctr., Inc. v. United States Envtl. Prot. Agency ("EPA")*, 344 F.3d 832 (9th Cir. 2003), *cert. denied*, 541 U.S. 1085, 124 S.Ct. 2811, 159 L.Ed.2d 246 (2004); *Association to Protect Hammersley v. Taylor Res., Inc.*, 299 F.3d 1007, 1016 (9th Cir.2002)

2. Pursuant to the parties' stipulation, PALCO's motion for summary judgment as to EPIC's claims alleging violations of the California Unfair Competition Law is stayed pending a final decision by the California Supreme Court on its review of cases concerning the question of whether the terms of Proposition 64 apply to cases pending at the time Proposition 64 became law.

3. Both Pacific Lumber and Scotia Pacific Lumber Company are Delaware corporations; both maintain principal places of business in Scotia, California.

(noting that, in 1972, "Congress passed the Clean Water Act amendments, 33 U.S.C. §§ 1251–1387, to respond to environmental degradation of the nation's waters."); *Natural Resources Def. Council ("NRDC") v. EPA,* 822 F.2d 104, 109 (D.C.Cir.1987) (citing 33 U.S.C. § 1311(a)). In substantial part, EPIC alleges that PALCO has used a variety of "point sources," *see* 33 U.S.C. § 1362(14), to discharge pollutants without first securing necessary NPDES permits. Absent such permits, EPIC claims, PALCO's system conflicts with defendants' CWA obligations.

## II. *Statutory and Regulatory Background*

With the goal of "restor[ing] and maintain[ing] the chemical, physical, and biological integrity of the Nation's waters," Congress enacted the CWA in 1972. 33 U.S.C. § 1251(a) (originally codified as the Federal Water Pollution Control Act, 62 Stat. 1155); *see Association to Protect Hammersley,* 299 F.3d at 1016; *Pronsolino v. Nastri,* 291 F.3d 1123, 1126 (9th Cir.2002) (observing that prior federal water pollution regulation "had proven ineffective"), *cert. denied,* 539 U.S. 926, 123 S.Ct. 2573, 156 L.Ed.2d 602 (2003). Built on a "fundamental premise" that the unauthorized "discharge of any pollutant by any person shall be unlawful," *NRDC v. EPA,* 822 F.2d at 109 (citing 33 U.S.C. § 1311(a)), the CWA "establishes a comprehensive statutory system for controlling water pollution." *Association to Protect Hammersley,* 299 F.3d at 1009 (citation and internal quotation marks omitted). This broad statutory scheme includes, *inter alia,* a National Pollutant Discharge Elimination System (NPDES) for regulation of pollutant discharges into the waters of the United States. *See* 33 U.S.C. §§ 1311(a), 1342(a). Under the NPDES, permits may be issued by EPA or by states that have been authorized by EPA to act as NPDES permitting authorities. *See* 33 U.S.C. § 1342(a)-(b); *see also Environmental Def. Ctr., Inc.,* 344 F.3d at 841 (holding that pollution dischargers must comply with "technology-based pollution limitations (generally according to the 'best available technology economically achievable,' or 'BAT' standard)."); *NRDC v. EPA,* 822 F.2d at 110 (noting that, when necessary, water quality-based standards may supplement technology standards). California has been so authorized.[4]

Not all pollutants or pollution sources fall within the purview of the NPDES. Under the CWA, "discharge of pollutant" is defined as "any addition of any pollutant to navigable waters from any *point source.*" 33 U.S.C. § 1362(12)(A) (emphasis added). The focus of both the CWA and NPDES, then, trains largely on pollutant discharges from "point sources," a term the Act defines as:

> any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be

**4.** The EPA delegated its permit-issuing authority to California on May 14, 1973. *See* 39 Fed.Reg. 26,061 (July 16, 1974). California administers its portion of the NPDES program through the Porter–Cologne Water Quality Control Act ("Porter–Cologne Act"), Cal. Water Code § 13000 *et seq.,* which, in turn, created a group of Regional Water Quality Control Boards charged with the responsibility of issuing Waste Discharge Requirements ("WDRs"). By every relevant measure, WDRs are equivalent to CWA permits, and in every relevant sense for this action, the Porter–Cologne Act imports its definitions from the CWA, including those for "pollutants," "discharge," and "point source." *See* Cal. Water Code § 13373.

discharged. This term does not include agricultural stormwater discharges and return flows from irrigated agriculture. *Id.* at § 1362(14); *see also id.* at § 1362(6) (defining "pollutant" broadly to include substances ranging from rock and sand to industrial and municipal industrial wastes).

■ The CWA distinguishes point sources from nonpoint sources. The NPDES recognizes—and functions on the basis of—this distinction, requiring permits only for point source emissions. *See, e.g., League of Wilderness Defenders v. Forsgren,* 309 F.3d 1181, 1183 (9th Cir. 2002) ("Point source pollution is distinguished from 'nonpoint source pollution,' which is regulated in a different way and does not require [the NPDES] type of permit."). Unlike point sources, nonpoint sources[5] are regulated indirectly: the CWA directs EPA to disseminate information regarding nonpoint pollution sources, *see* 33 U.S.C. § 1314(f), but it is often through state management programs that nonpoint sources are monitored and controlled. *See Oregon Natural Desert Ass'n v. Dombeck,* 172 F.3d 1092, 1096–97 (9th Cir.1998), *cert. denied,* 528 U.S. 964, 120 S.Ct. 397, 145 L.Ed.2d 310 (1999).[6]

## III. *Procedural History*

In an effort to compel PALCO to comply with the putative terms of the CWA, EPIC brought a citizen-suit action under section 505(a) of the CWA, 33 U.S.C. section 1365(a), against PALCO, the EPA, and then-EPA Administrator Christine Todd Whitman. EPIC's first two claims allege, generally stated, that PALCO's drainage system employs a number of unpermitted point sources to discharge pollutants; EPIC later added a third claim, alleging that the adoption of a particular EPA regulation—40 C.F.R. section 122.27—constituted an *ultra vires* act. A number of potentially dispositive motions followed.

On June 6, 2003 the court denied EPA's motion to dismiss and denied PALCO's motion to dismiss in part, concluding that EPIC could pursue a claim under the Administrative Procedures Act ("APA") in this court and that EPIC's claim was not time-barred. On October 14, 2003 the court denied EPIC's motion for summary adjudication on its third claim for relief, granting EPA's and PALCO's cross-motions for summary adjudication and construing 40 C.F.R. section 122.27 to be consistent with the governing provisions of the CWA. On January 23, 2004 the court denied PALCO's motion to dismiss EPIC's remaining claims (that is, its first and second claims for relief) under Federal Rule of Civil Procedure 12(b)(6) and held that PALCO's point sources—to the extent they exist—must comply with the terms of the NPDES and the CWA. On April 19, 2004 the court denied PALCO's motion to certify three of the court's decisions for

---

**5.** As the Ninth Circuit has noted, "nonpoint source pollution is not statutorily defined." *League of Wilderness Defenders,* 309 F.3d at 1184. As the Ninth Circuit has also noted, "nonpoint source pollution ... is widely understood to be the type of pollution that arises from many dispersed activities over large areas ... not traceable to any single discrete source." *Id.* The paradigmatic example of nonpoint source pollution, the Ninth Circuit adds, is automobile residue—whether rubber, metal, oil, or gas—left on the roadways. *Id.*

**6.** The CWA's distinct approach to regulation of "nonpoint sources" should not be seen as an indication that "nonpoint sources" constitute an insignificant source of pollution. In fact, quite the opposite is true. As the Ninth Circuit recently observed, nonpoint source pollution from automobile use itself outstrips point source pollution from chemical spills, factories, and sewage plants; indeed, nonpoint source pollution from automobile use is the largest source of water pollution in the United States. *See League of Wilderness Defenders,* 309 F.3d at 1184 (citation omitted).

interlocutory review under 28 U.S.C. section 1292(b). On July 12, 2005 PALCO filed a Notice of Intent ("NOI") to comply with the terms of the General Permit to Discharge Storm Water Associated With Industrial Activity (WQ Order No. 97–03–DWQ) ("Industrial General Permit" or "IGP") for PALCO's logging operations in the Bear Creek Watershed and Storm Water Pollution Prevention Plan ("SWPPP") which outlines practices and procedures PALCO will implement to reduce or prevent industrial pollutants in storm water discharges. On April 28, 2006 the court denied defendants' motion for summary judgment with respect to EPIC's first and second claims for relief, rejecting PALCO's argument that the claims were rendered moot by procuring IGP. The court also denied EPIC's cross-motion for partial summary judgment on the issue of defendants' liability. The court further ordered additional briefing on the issue of what EPIC must prove to establish defendant's liability under the CWA.

PALCO now urges the court to hold that EPIC does not have standing to bring this suit on its own behalf or on behalf of its members. EPIC, in turn, asks the court to hold PALCO liable for violations of the CWA.

*LEGAL STANDARD*

I. *Summary Judgment*

Summary judgment is proper when the pleadings, discovery, and affidavits show that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Material facts are those which may affect the outcome of the proceedings. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.

*Id.* The party moving for summary judgment bears the burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). On an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id.*

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Mere allegations or denials do not defeat a moving party's allegations. *Id.; see also Gasaway v. Northwestern Mut. Life Ins. Co.*, 26 F.3d 957, 960 (9th Cir.1994). The court may not make credibility determinations, *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505, and inferences drawn from the facts must be viewed in the light most favorable to the party opposing the motion. *Masson v. New Yorker Magazine*, 501 U.S. 496, 520, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991).

II. *Standing*

■ An Article III court cannot entertain the claims of a litigant unless that party has demonstrated the threshold jurisdictional issue of whether it has constitutional and prudential standing to sue. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The doctrine of standing encompasses both constitutional and statutory considerations. *Id.* Article III, section 2 of the United States Constitution extends the judicial power of the federal courts only to cases or controversies. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998).

■ The party invoking federal jurisdiction bears the burden of establishing three requirements in order to meet the "irreducible constitutional minimum of standing." *Defenders of Wildlife*, 504 U.S. at 560, 112 S.Ct. 2130. To satisfy Article III's requirements a plaintiff must show "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. Inc.*, 528 U.S. 167, 181, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (citing *Defenders of Wildlife*, 504 U.S. at 560–61, 112 S.Ct. 2130). In addition, where Congress is the source of the alleged legal violation, the Supreme Court has recognized a prudential component to standing requiring that the plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory provision invoked. *Bennett v. Spear*, 520 U.S. 154, 163, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997).

■ An organization may have standing to sue "in its own right . . . to vindicate whatever rights and immunities the association itself may enjoy," and in doing so, "may assert the rights of its members, at least so long as the challenged infractions adversely affect its members' associational ties." *Warth v. Seldin*, 422 U.S. 490, 511, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). In order to establish organizational standing, plaintiffs must "meet the same standing test that applies to individuals." *Spann v. Colonial Vill. Inc.*, 899 F.2d 24, 27 (D.C.Cir.1990), *cert. denied*, 498 U.S. 980, 111 S.Ct. 508, 112 L.Ed.2d 521 (1990) (internal quotations and citations omitted). "In those cases where an organization is suing on its own behalf, it must establish

concrete and demonstrable injury to the organization's activities—with a consequent drain on the organization's resources—constituting more than simply a setback to the organization's abstract social interests. Indeed, the organization must allege that discrete programmatic concerns are being directly and adversely affected by the challenged action." *Common Cause v. Federal Election Comm'n*, 108 F.3d 413, 417 (D.C.Cir.1997) (internal quotations omitted). *See also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982).

■ Moreover, even if the organization has not suffered injury to itself, it may have standing to assert the rights of its members if (1) its members would have standing to sue on their own; (2) the interests it seeks to protect are germane to its purpose; and (3) its claim and requested relief do not require participation by individual members. *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). *See also Warth*, 422 U.S. at 511, 95 S.Ct. 2197 ("Even in the absence of injury to itself, an association may have standing solely as the representative of its members."); *Sierra Club v. Morton*, 405 U.S. 727, 734–41, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) (association must allege that its members are suffering immediate or threatened injury of the sort that would be a justiciable case had members brought suit individually). "The possibility of such representational standing, however, does not eliminate or attenuate the constitutional requirement of a case or controversy." *Warth*, 422 U.S. at 511, 95 S.Ct. 2197.

## DISCUSSION

### I. *PALCO's Motion for Summary Judgment*

■ A plaintiff must establish that it has constitutional and prudential standing

to sue. *Defenders of Wildlife*, 504 U.S. at 560, 112 S.Ct. 2130. In order to meet Article III's case or controversy requirement, an organizational plaintiff can either assert standing on its own behalf or standing on behalf of its members. *See Warth*, 422 U.S. at 511, 95 S.Ct. 2197. In its motion for summary judgment, PALCO argues that EPIC has neither organizational nor representational standing in the present action. First, PALCO asserts that EPIC cannot demonstrate an injury-in-fact on its own behalf because its services have not been diminished and because an informational injury is insufficient to overcome the injury-in-fact requirement. EPIC need not demonstrate organization standing. Even if the organization has not suffered injury to itself, it may have standing to assert the rights of its members. *Hunt*, 432 U.S. at 343, 97 S.Ct. 2434. *See also Warth*, 422 U.S. at 511, 95 S.Ct. 2197. Because EPIC need only demonstrate that it has standing on behalf of its members and has done so adequately, the court will not address PALCO's organizational standing arguments.

■ EPIC can successfully allege representational standing "if its members would have standing to sue on their own behalf, the interests at issue are 'germane' to [EPIC's] mission, and neither the substantive claim nor the remedy sought necessitates the participation of any individual member of [EPIC]." *Ocean Advocates v. United States Army Corps of Eng'rs*, 361 F.3d 1108, 1121 (9th Cir.2004) (citing *Laidlaw*, 528 U.S. at 167, 120 S.Ct. 693). In its motion for summary judgment, PALCO asserts only that EPIC has failed to show that any of its members would have standing on their own behalf. PALCO does not challenge EPIC's standing based on the other standing requirements—that the interests are germane to EPIC's mission and that the individual participation of EPIC members is not required. Because the party invoking federal jurisdiction bears the burden of establishing all of the requirements of standing, *Defenders of Wildlife*, 504 U.S. at 560, 112 S.Ct. 2130, the court will examine whether EPIC has established each of the requirements in order to overcome summary judgment. For representational standing purposes, an organizational plaintiff needs to show that one of its members has standing in his or her own right. *See Warth*, 422 U.S. at 511, 95 S.Ct. 2197. Therefore, the court need only address the standing of a single EPIC member who meets the constitutional requirements.

In order to satisfy the standing requirement of Article III, an individual plaintiff must show that "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Laidlaw*, 528 U.S. at 180–81, 120 S.Ct. 693; *Morton*, 405 U.S. at 734–41, 92 S.Ct. 1361. Here, PALCO asserts that Richard Gienger and Paul Mason have not satisfied the injury-in-fact requirement. The court disagrees for the reasons discussed below.

### A. Standing of EPIC Individual Members

#### 1. Richard Gienger

■ PALCO asserts that Mr. Gienger has not established an individual, particularized injury distinct from EPIC's institutional interests. As an independent contractor for EPIC, defendants argue that Mr. Gienger's interests have merged with those of the organization. Therefore, defendants maintain that EPIC cannot assert representational standing based on

Mr. Gienger's standing. Assuming *arguendo* that Mr. Gienger was paid for all of his activities in Bear Creek, defendants have provided no case law to support the proposition that such an employee would not have standing in his own right to assert claims based on injuries suffered *qua* employee. Indeed, *Smith v. Pacific Props. & Dev. Corp.*, 358 F.3d 1097 (9th Cir.2004), a case cited by PALCO in its motion, would suggest otherwise. That case held that housing testers, some of whom may be compensated for their work, had standing to bring suits for violations of the Fair Housing Amendments Act. *Id.* at 1105. Other cases, several of which EPIC cites in its opposition, suggest no such merger doctrine for employees exists. *See, e.g., NRDC v. Southwest Marine, Inc.*, 945 F.Supp. 1330, 1334 (S.D.Cal.1996), *aff'd* 236 F.3d 985 (9th Cir.2000). Additionally, PALCO has provided no evidence to show that all of Mr. Gienger's alleged injuries for standing purposes arise from his position as an independent contractor. *See* Def's Opp'n, at 13:27–14:24. PALCO has established only that Mr. Gienger was reimbursed for costs incurred when visiting Bear Creek, although it is far from certain that EPIC distributed funds for this purpose. Gienger Supp. Dec. ¶ 17. Regardless of whether Mr. Gienger's injuries arose from his work as an independent contractor, there is no barrier to an employee establishing a particularized injury based on his employment with an organization of which he is also a member. Furthermore, Mr. Gienger can also establish standing as a member. The fact that the two positions, "employee" and "member," may overlap in their experiences does not mean that the totality of his experiences cannot be considered.

As the court has noted, Mr. Gienger must show injury-in-fact, causation, and redressability to establish standing.

A plaintiff alleging violations of the CWA can establish injury-in-fact by showing "a connection to the area of concern sufficient to make credible the contention that the person's future life will be less enjoyable—that he or she really has or will suffer in his or her degree of aesthetic or recreational satisfaction—if the area in question remains or becomes environmentally degraded." *Ecological Rights Found. (ECF) v. Pac. Lumber Co.*, 230 F.3d 1141, 1149 (9th Cir.2000). Mr. Gienger has sufficiently established that he has visited the specific area in question, the Bear Creek watershed, frequently for the purposes of both recreation, Gienger Tr. at 78:1–6, and his conservation interests, *e.g.*, Gienger Tr. at 75:23–25; 76:1–2. *Cf. Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 886–89, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) (denying standing because members of environmental organization had only visited "the vicinity" of the land involved in dispute). He has personally observed the sediment in Bear Creek which EPIC attributes to PALCO. Gienger Dec.¶¶ 12 & 16. Mr. Gienger's recreational and conservation interests are harmed by the sediment deposited. *Id.* He has thus demonstrated a "tangible, continuing connection" to the particular location affected sufficient to establish injury-in-fact for standing purposes. *ECF*, 230 F.3d at 1148. According to Mr. Gienger's testimony, his various interests are harmed by PALCO's failure to secure a permit NPDES permit. Gienger Supp. Dec. ¶ 9. He has therefore satisfied the causation requirement for standing. Finally, Mr. Gienger states that his injuries will be redressed if this court enjoins PALCO from discharging stormwater without a NDPES permit. The court concludes that Mr. Gienger has satisfied the Article III standing requirements, and, therefore, EPIC may properly base its representational standing claim on Mr. Gienger.

## 2. Paul Mason

■ While the standing of a single member is sufficient to establish an organization's standing, the court will examine the standing of a second EPIC member, Paul Mason,[7] for prudential reasons. PALCO has not offered any direct challenges to Mr. Mason's standing beyond the argument that Mr. Mason cannot demonstrate a concrete and particularized injury-in-fact because he resides in Sacramento, several hundred miles away from Bear Creek. "Factors of residential contiguity and frequency of use may certainly be relevant to that determination, but are not to be evaluated in a one-size-fits-all, mechanistic manner." *ECF*, 230 F.3d at 1149; *see also Friends of the Earth v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 159–60 (4th Cir.2000) (en banc) (same). Should Mr. Mason visit the Bear Creek area only once a year, he would not be "precluded from litigating to protect the environmental quality of [that area] simply because he cannot visit more often." *ECF*, 230 F.3d at 1150. Mason has satisfied the requirements for injury-in-fact illuminated in *ECF*: repeated use as well as credible allegations of future use. *Id.* at 1149. He has visited Bear Creek over a dozen times before this suit commenced as well as several times during the epic tenure of this suit. *See* Mason Tr. 90:13–20(visits prior to 2001); 87:22–25–88:1–3 (visit in September 2005). Moreover, he has expressed his intent to visit Bear Creek in the future. Mason Supp. Dec. ¶ 4. He has sufficiently demonstrated that he has aesthetic, recreational, and conservational interests in Bear Creek and that these interests are harmed by PALCO's alleged activities. Like Mr. Gienger, Mr. Mason has established that redress of these injuries is appropriate through this court. Accordingly, the court concludes that Mr. Mason has individual standing to bring this suit.

## 3. Craig Bell

PALCO asserts that Craig Bell does not have standing in this case because he was not a member of EPIC at the time this suit was initiated. To support this contention, PALCO relies upon *Friends of the Earth, Inc. v. Crown Cent. Petroleum Corp.*, 95 F.3d 358, 360 (5th Cir.1996). In that case, the Fifth Circuit merely recited the fact that the district court had found that several of the standing witnesses had not been members of the plaintiff organization at the inception of the suit. EPIC presents no case law to support its contention that representational standing may be based on a member who joined the organization after the suit has been filed. At most, EPIC would have standing to sue based on Bell's injuries from 2003, when he joined EPIC. Because the court has determined that two of EPIC's other members properly have standing in this case, it is not necessary to decide whether EPIC may invoke standing based on Bell's individual standing.

## 4. Bill Eastwood

■ PALCO advances three arguments against Bill Eastwood's assertions

---

7. There appears to be some dispute between the parties as to whether Mr. Mason was presented as a standing witness in his own right. In its moving papers, PALCO acknowledges that Mr. Mason was offered as a standing witness. Def's Mot., at 4. For the purposes of asserting representational standing, EPIC initially identified four of its members who claim to have been adversely affected by PALCO's activities: Cynthia Elkins, Craig Bell, William Eastwood, and Paul Gienger. *See* Diveley Decl., Exh. A, at 6. EPIC subsequently substituted Mr. Mason for Ms. Elkins as a standing witness. *See* Diveley Decl., Exh. B. PALCO deposed Mr. Mason concerning his alleged injuries. *See* Mason Tr. at 90:13–20. Therefore, it is clear that EPIC can assert standing on the basis of Mr. Mason's own standing.

of standing. First, PALCO alleges that Mr. Eastwood has not suffered a particularized and concrete injury. Second, it contends that his fishing interests in the watershed are too generalized to satisfy the personal and particularized injury-in-fact requirement. Finally, PALCO argues that the geographic distance between his conservational activities with salmon in Eel Creek and Bear Creek cannot survive the traceability requirement for standing.

Mr. Eastwood has not visited Bear Creek but has repeatedly observed it when driving over the creek in his car. This indirect contact with the area is insufficient to establish standing under the Supreme Court's reasoning in *Laidlaw.* In that case, the individual members of an organizational plaintiff alleged that they were deterred from visiting an area because of alleged environmental violations. *See Laidlaw,* 528 U.S. at 181–82, 120 S.Ct. 693 (member averred that he would like to visit the river as he had done as a teenager but would not do so because of his concerns about pollution in the river, which he observed during his occasional drives over the river); *see also ECF,* 230 F.3d at 1150 (assertions of deterrence to exercise recreational interests were sufficient to establish injury-in-fact). In this case, Mr. Eastwood alleges no such deterrence from exercising his other interests in Bear Creek. He merely observes the Creek during his many drives over it and claims to be harmed by his observations of muddy, turbid water. Eastwood Tr. at 92:15–18. Therefore, Mr. Eastwood has not sufficiently established that he has suffered a personal and particularized injury.

### B. *Germaneness*

Having established that two of its members have individual standing, EPIC must also show that the interests it seeks to protect are germane to its organization-al purpose. EPIC's organizational goals are to promote "clean water and healthy watersheds through public education and outreach, grassroots citizen advocacy and strategic litigation." Mason Dec. ¶ 4. The interests in this case involve the protection of the Bear Creek and the Eel Creek watershed and are germane to EPIC's stated purpose. *See Ocean Advocates,* 361 F.3d at 1121.

### C. *Need for Individual Member Participation*

The final requirement for representational standing is prudential. To claim representational standing, the litigation involved must not require the participation of individual members. This requirement depends in large part on the nature of the relief being sought. When an organization seeks prospective, equitable relief, "it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured." *Warth,* 422 U.S. at 515, 95 S.Ct. 2197. In its complaint, EPIC seeks declaratory and injunctive relief as well as civil penalties and restitutions. FAC ¶¶ 65–69. If granted, any of these forms of relief will inure to the benefit of the organization and its members. Nor is there any need for individualized proof because neither the "claims nor the relief sought equire[ ] the District Court to consider the individual circumstances of any aggrieved [ ] member." *International Union, United Auto. Workers v. Brock,* 477 U.S. 274, 287, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986). EPIC's claims are based on the injuries to Bear Creek and the surrounding watershed and, as such, do not require individualized proof. The parties have not raised the issue of whether EPIC has satisfied the zone of interests requirement, and it does not seem to be in issue. Therefore, the court concludes that

EPIC has standing in its capacity as a representative of its members.

In sum, EPIC has demonstrated that it has representational standing to bring this suit on behalf of its members. Accordingly, the court DENIES PALCO'S motion for summary judgment on standing.

## II. *EPIC's Motion for Summary Judgment*

EPIC asks this court to grant summary judgment on its first and second claims for relief. EPIC contends that it has shown that PALCO has violated both section 301(a) of the CWA, codified at 33 U.S.C. § 1311(a) and section 402(p) of the CWA, codified at 33 U.S.C. § 1342(p) and is therefore entitled to summary judgment.

To support its claims, EPIC's experts recorded evidence of alleged discharges at seventeen different sites ("Locations No. 1–17") in the Bear Creek watershed. Based primarily on that evidence, EPIC alleges that PALCO is liable for (1) 13 violations of section 301(a) by discharging sediment on certain dates from specific point sources in the Bear Creek watershed without securing a NPDES permit; (2) 5,957 violations of section 402(p) for failing to apply for and obtain coverage under California's general permit for discharges of storm water associated with industrial activity from March 8, 2004 to July 12, 2005 at each of 17 discharge points; and (3) 2,633 violations of section 402(p) for discharges of stormwater associated with industrial activity without a NPDES permit for the period May 25, 1996 to March 8, 2004. PALCO argues that EPIC has

failed to make a prima facie case for violations of the CWA.

### A. *Section 301(a)*

To meet its burden under section 301(a),[8] EPIC contends that it must show that PALCO (1) discharged (2) a pollutant (3) from a point source (4) to navigable waters (5) without an NPDES permit. PALCO does not dispute this enumeration of EPIC's burden. Def's Add. Br. at 3 n. 2. This understanding comports with the elements set out by the Ninth Circuit. *See Committee to Save Mokelumne River v. East Bay Mun. Util. Dist.*, 13 F.3d 305, 309 (9th Cir.1993). The parties disagree, however, on the evidence required to prove each element. The court will address in turn each element and assess the evidence proffered by EPIC to satisfy each element.

### 1. Discharge

Section 501(12) of the CWA defines "discharge of any pollutant" as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). The Ninth Circuit has addressed the definition of this term in *Mokelumne River*, 13 F.3d at 308. The court held that surface runoff collected and channeled in diversion ditches, channels, and gullies, *inter alia*, satisfied the definition of discharge. *Id.* at 307, 308. In doing so, the court distinguished its holding from two cases involving dams, which did "not *add* pollutants from the outside world." *Id.* at 308 (discussing *National Wildlife Fed'n v. Consumers Power Co.*, 862 F.2d 580, 584 (6th Cir.1988) and *National Wildlife Fed'n v. Gorsuch*, 693 F.2d

---

**8.** Section 301(a) of the CWA is codified at 33 U.S.C. § 1311 and reads in its entirety as follows:
§ 1311. Effluent limitations
(a) Illegality of pollutant discharges except in compliance with law. Except as in compli-
ance with this section and sections 302, 306, 307, 318, 402, and 404 of this Act [33 USCS §§ 1312, 1316, 1317, 1328, 1342, 1344], the discharge of any pollutant by any person shall be unlawful.

156, 165 (D.C.Cir.1982)) (emphasis in original).

PALCO contends that to prove the addition of a pollutant, EPIC must conduct sampling of the runoff before it reached the discharge locations to prove that the sediment was added at the that discharge location. PALCO argues that without a point of comparison EPIC cannot prove that pollutant was added or discharged. PALCO even suggests that water may prove to be cleaner when it left the various discharge points than when it entered. Def's Opp. at 19 n. 12. This precise argument was advanced and rejected in *Mokelumne River,* 13 F.3d at 309.

The Ninth Circuit has indicated that there is no such requirement. In *Rybachek v. EPA,* 904 F.2d 1276 (9th Cir.1990), the court upheld EPA's interpretation of "addition" to include both redepositing material from the streambed into the stream as well as depositing material from outside the stream into it; *cf. Headwaters, Inc. v. Talent Irrigation Dist.,* 243 F.3d 526 (9th Cir.2001) (direct application of herbicide into irrigation canals constituted a discharge under the CWA). Similarly, the court concluded that there was no material dispute of fact raised by the defendants' contention that there was no net increase in acidity of runoff from a facility. *Mokelumne River,* 13 F.3d at 309. PALCO's attempts to distinguish *Mokelumne River* are unpersuasive. The CWA "categorically prohibits any discharge of a pollutant from a point source without a permit." *Id.* at 309. EPIC need not conduct sampling above the road prism in order to demonstrate a discharge.

EPIC offers evidence collected at twelve different discharge points on thirteen separate occasions to establish violations of section 301(a). Pl's Mot. at 41. To prove each discharge, EPIC offers eye-witness observations at each of the sites as well as photographic and video documentation of some of the discharges. *See, e.g., id.* at 23 (describing documentation at Location No. 4). EPIC also measured the turbidity levels at many of the alleged points of discharge. *See, e.g.,* Lozeau Decl., Ex. J ("Proposed Testimony of Dr. Andrew Collison Regarding Sediment Sources and Delivery to the Waters of Bear Creek," by Andrew Collison, Ph.D.) ("Collison Report") at B–1 (discussing turbidity levels and subsequent lab analysis of sediment concentration found at site No. 1). In response, PALCO argues that EPIC's evidence of additions of pollutant is faulty at several of the locations. PALCO contends that the measurement techniques employed by EPIC's experts were unreliable at Locations No. 6 and No. 11 and may have artificially introduced sediment into the samples. Def's Opp. at 31, 35. Similarly, it argues that the conditions at Locations No. 7 and 8 indicate that water flowed through natural materials before EPIC took the samples, which would render the measurements of sediment unreliable. *Id.* at 32. Finally, PALCO contends that since no measures of sediment were taken at Location No. 5, EPIC cannot establish the addition of sediment at that location. *Id.* at 30. In light of the eyewitness accounts of discharges at each location, PALCO's contentions raise issues as to the weight of the evidence, which the court cannot decide on summary judgment. However, PALCO's arguments do indicate that there is a genuine issue of disputed fact on the issue of discharge at Locations Nos. 5, 6, 7, 8 and 11. EPIC has sufficiently established the element of discharge with respect to the other locations.

2. Pollutant

The CWA expressly includes sediment in its definition of pollutant. 33 U.S.C.

§ 1362(6). EPIC presents evidence of the presence of sediment at each of the thirteen alleged discharges in the form of expert witness observation, turbidity measurements, and video and photographic documentation. It is difficult to disentangle the evidence necessary to prove discharge from that needed to establish the presence of the pollutant. Where PALCO has raised questions of fact about discharges for Locations No. 5, 6, 7, 8, and 11, it has created issues of fact for this element as well. For the other locations, the evidence presented is sufficient to establish that a pollutant was present in the discharges at those sites.

### 3. From a Point Source

The parties disagree about whether this element is in fact one element or two. In its opposition, PALCO urges the court to interpret "from a point source" as two distinct elements: "from" and "point source." Def's Opp. at 14. Notably, PALCO did not make this distinction in its additional briefing on the elements of proof required to demonstrate liability under the CWA. PALCO argues that the "from" element mandates a direct connection between the point source and the navigable water. *Id.* It further argues that EPIC must provide evidence to demonstrate that the alleged point sources connected to a navigable water during EPIC's observations of the thirteen alleged discharges. The court finds that the issue of connectivity between a point source and a navigable water is better addressed as part of the element "to navigable waters" and will discuss it there.

Establishing that PALCO operates point sources has been the crux of this dispute from the outset. In its April 28, 2006 order, the court advised EPIC to put forth actual proof that PALCO made discharges from a discrete point source or sources

into Bear Creek. At that time, the court noted that EPIC had provided no specific statements or evidence that PALCO operates point sources such as culverts, ditches or conduits from which storm water or pollutants are discharged into Bear Creek.

The CWA provides a definition of point source in 33 U.S.C. § 1362(14):

> The term 'point source' means any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged. This term does not include agricultural stormwater discharges and return flows from irrigated agriculture.

EPIC argues that unpaved logging roads are sources of sediment and that the sediment is discharged via inboard ditches to stream crossing culverts, ditch relief culverts and cross drain culverts, and rolling dips. PALCO argues that these road features are Best Management Practice ("BMPs") in compliance with the California Forest Practice Rules and cannot be point sources. According to PALCO, the BMPs are designed to disperse storm water on the hillside in order to promote natural filtration. Under this argument, a device designed to lessen runoff could never be a point source. Thus, the court is faced with two issues. First, whether as a matter of law these BMPs can be point sources. Second, as a matter of fact, whether EPIC has proven that these are point sources.

Courts have interpreted the term point source broadly to include, *inter alia,* a gold leachate system capable of overflowing, *United States v. Earth Scis., Inc.,* 599 F.2d 368 (10th Cir.1979); a cattle feedlot capable of discharging pollutants during an extreme storm event, *Carr v. Alta Verde*

*Indus., Inc.*, 931 F.2d 1055 (5th Cir.1991); and leachate that flowed into a pond and through a culvert to a marsh, *Dague v. City of Burlington*, 935 F.2d 1343 (2d Cir. 1991). These interpretations of point source suggests that the term includes ditches and culverts like the ones EPIC alleges to be point sources. The Eleventh Circuit has held that stormwater collected and channeled by pipes and culverts can be point sources. *See Driscoll v. Adams*, 181 F.3d 1285 (11th Cir.1999) (reversing grant of summary judgment for defendants and concluding that discharge was a point source on the basis that "it is undisputed that Adams collected stormwater by pipes and other means, and that the stormwater was discharged into the stream"). The strongest support for this point finds its source in the plurality opinion written by Justice Scalia in *Rapanos v. United States*, —— U.S. ——, 126 S.Ct. 2208, 165 L.Ed.2d 159 (2006) where he contrasts the term "navigable waters" with "point source." In doing so, the opinion describes point source as "watercourses through which intermittent waters typically flow" such as ditches. *Id.* at 2223. *But see* 126 S.Ct. at 2243 (Kennedy, J., concurring) (contending that intermittent flows may be characterized as navigable waters).

In determining the evidentiary showing required to establish a point source, courts considering similar facts have concluded that runoff channeled through ditches is a point source. The Fifth Circuit has adopted the position that "surface runoff collected or channeled by the operator constitutes a point source discharge." *Sierra Club v. Abston Constr. Co.*, 620 F.2d 41, 44 (5th Cir.1980). In determining that liquid

manure spreading operations are a point source, the court concluded that a swale, which is a ditch on a contour, coupled with the pipe leading into the ditch that leads into the stream was a point source. *Concerned Area Residents for Env't v. Southview Farm*, 34 F.3d 114, 118 (2d Cir.1994). Additionally, defendants need not construct the conveyances "so long as they are reasonably likely to be the means by which pollutants are ultimately deposited into a navigable body of water." *Id.* at 45. The Tenth Circuit "had no problem finding a point source" in the use of sumps and ditches to drain a mining operation. *Earth Sciences*, 599 F.2d at 374. That court found a point source where liquid overflows a wall or flows through a fissure in a sump. *Id.* ("[T]he escape of liquid from the confined system is from a point source."). While PALCO contends that remedial measures, such as the BMPs in this case, can never be point sources, the *Earth Sciences* opinion suggests otherwise. *Id.* When a device or system designed to channel or diffuse runoff fails and instead channels runoff into a navigable water, the points of failure such as the sump fissures in *Earth Sciences* can be point sources. Similarly, in *Mokelumne River*, the Ninth Circuit found that efforts by the California Water Regional Quality Control Board to eliminate runoff from acid mine drainage were discharging pollutants under the terms of the CWA. 13 F.3d at 310 (Ferndandez, J., concurring).[9] As a matter of law, BMPs may be point sources.

 The second inquiry concerns whether EPIC has made an evidentiary showing sufficient to demonstrate that the

---

**9.** In that case, the issue of whether certain devices were point sources was not in dispute. Defendants conceded that the spillway and valve of the dam and reservoir in the dispute were point sources. And the majority "appear[ed] to agree" with that assertion. *Id.* at

310 (Fernandez, J., concurring). Judge Fernandez noted in his concurrence that the devices deemed point sources were in fact the product of remedial efforts aimed at cleaning up acid mine drainage. *Id.*

ditches and culverts at each of the twelve locations are point sources. It has not. The Ninth Circuit has not directly addressed the type of evidence required to prove that sedimentary discharges from ditches and culverts are point sources. In *Pronsolino v. Nastri,* 291 F.3d 1123, 1126, (9th Cir.2002), the court gave sediment runoff from timber harvesting as an example of a nonpoint source, but this example was merely dicta. In the same case, the court described erosion related to road surfaces as nonpoint source, but this was merely a recitation from the district court's opinion which relied on the parties' classifications of pollution as nonpoint source. *See Pronsolino v. Marcus,* 91 F.Supp.2d 1337, 1340 (N.D.Cal.2000) (Alsup, J.) (citing to Joint Statement of Undisputed Facts). The Ninth Circuit made that determination after reviewing a full record and a jury's findings of fact. In *Trustees for Alaska v. EPA,* 749 F.2d 549, 558 (9th Cir.1984), the court concluded only that the EPA did not exceed its authority in regulating as a point source "discharge water [ ] released from a sluice box" because it was "a confined channel" within the definition of point source. However, that case involved the review of a determination of the EPA not a factual finding that a certain discharge is a point source.

 The sum of authority indicates that whether a ditch, culvert, or other BMP may constitute a point source is a highly fact-based inquiry. EPIC must demonstrate that these BMPs are discrete conveyances that channel runoff. PALCO raises a disputed issue of fact as to whether any of the ditches in question channel or instead diffuse water. In particular, PALCO questions EPIC's observations as to how the storm water entered the tributaries. *See* Def's Opp'n at 26 (raising

questions about Location No. 1). If, as PALCO contends, the water enters in diffuse form, then the ditches and culverts have not channeled the water and these ditches are not point sources. On the other hand, if EPIC demonstrates that the ditches channel the water into the tributaries, the ditches are likely point sources. EPIC has not sufficiently demonstrated for each of these locations that the water was channeled, and therefore it has not proven that the twelve locations are point sources.

### 4. To Navigable Waters

 As an initial matter, the parties agree that Bear Creek is a navigable water pursuant to 33 U.S.C. section 1362(7). JSUF, Fact No. 12 (March 1, 2006). The The parties disagree as to two matters: first, the correct legal standard for navigable waters; second, what evidence is required and whether EPIC's evidentiary proffer is sufficient to show that the streams in question are navigable waters. A third, related issue concerns whether EPIC must show that the point source directly delivered the sediment by demonstrating that the runoff reaches Bear Creek by surface flow and that the runoff contains a pollutant when it enters Bear Creek.

 First, EPIC argues that the Class II and Class III streams into which it observed discharges from each of the twelve alleged point sources are navigable waters. The Supreme Court recently refined the test for navigable waters. *Rapanos,* 126 S.Ct. at 2221; *id.* at 2251 (Kennedy, J., concurring). That case was decided 4–4–1, with Justice Scalia writing an opinion for the plurality, Justice Kennedy writing a separate opinion and concurring in the judgment, and Justice Stevens writing

for the dissenters.[10] Although there is some argument that the plurality and concurring opinions provide two alternative standards for CWA jurisdiction,[11] the Ninth Circuit's interpretation of *Rapanos* is binding on this court. In *Northern Cal. River Watch v. City of Healdsburg*, 457 F.3d 1023, 1023 (9th Cir.2006), the Ninth Circuit concluded that the significant nexus test set out in Justice Kennedy's concurrence is controlling. Therefore, EPIC must demonstrate that the streams in dispute have a significant nexus to Bear Creek.

▄▄▄▄▄ Under the significant nexus test, the party seeking to invoke the court's jurisdiction must present evidence of a hydrologic connection. *Rapanos*, 126 S.Ct. at 2250-51 (Kennedy, J., concurring). That connection may suffice in some but not all cases to show "some measure of the significance of that connection for downstream water quality" *Id.* at 2251. EPIC has offered evidence in PALCO's GIS maps, which it claims is the best information available, to demonstrate a hydrological connection between each of the streams in dispute and Bear Creek. Collison Report at 3. PALCO argues that the maps, without firsthand observations of the connections between the streams and Bear Creek, are insufficient to establish a substantial nexus. PALCO also contends that the even if the maps were sufficient, they are unreliable. The court finds that EPIC's reliance on the map is sufficient to establish some sort of a hydrological connection, even for those Class II and Class III streams which are intermittent waterflows. PALCO has offered only assertions as to the maps' unreliability but has not offered facts to demonstrate that the maps indicated a connection between any of the streams in question and Bear Creek which did not in fact exist. At the summary judgment stage, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). PALCO has not put forth specific facts to rebut EPIC's showing and create a genuine factual dispute as to the hydrologic connection between the streams and Bear Creek.

A hydrologic connection without more will not comport with the *Rapanos* standard in this case. Because the evidence indicates that certain of the Class II and all of the Class III streams are intermittent or ephemeral watercourses, *see* Collison Report at 3, EPIC must demonstrate that these streams have some sort of significance for the water quality of Bear Creek. None of the evidence offered by EPIC—field observations, the GIS map, or expert testimony—address this part of the substantial nexus standard. In *Northern Cal. River Watch v. City of Healdsburg*, No. 01–04686, 2004 WL 201502 (N.D.Cal. Jan. 23, 2004) (Alsup, J.), *aff'd*, 457 F.3d 1023 (9th Cir.2006), a decision rendered before *Rapanos* but affirmed by the Ninth Circuit in light of *Rapanos*, the court con-

---

10. Justice Breyer also filed a separate dissent. *Id.* at 2266.

11. The EPA urges the court not to follow the Kennedy opinion based on the test set out in *Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977): "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as the position taken by those Members who concurred in the judgments on the narrowest grounds." In its motion to clarify the court's opinion in *Healdsburg*, the United States urged the Ninth Circuit to interpret *Rapanos* to provide two alternative standards for CWA jurisdiction. Motion of the United States as Amicus Curiae to clarify the court's opinion, *Northern Cal. River Watch v. City of Healdsburg*, 457 F.3d 1023 (9th Cir.2006) (No. 04–15442). Stipulation of the Parties, Exh. A.

sidered both evidence of surface connections between a pond and a navigable water as well as ecological connections. *Id.* at *30 (relying upon similar connections in *United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985)). Ecological evidence is not a *sine qua non* for establishing a substantial nexus; however, EPIC has provided no evidence that the streams "significantly affect the chemical, physical, and biological integrity of other covered waters." *Rapanos,* 126 S.Ct. at 2248 (Kennedy, J., concurring). The court finds that EPIC has not established that the streams are navigable waters.

Finally, PALCO argues that EPIC must provide proof to "demonstrate the flow of pollutant along" the stream and into Bear Creek. *Rapanos,* 126 S.Ct. at 2228. *See also Concerned Area Residents for Env't v. Southview Farm,* 34 F.3d 114, 118–19 (2d Cir.1994). However, this requirement, if it exists, comes from Justice Scalia's plurality opinion in *Rapanos,* which has not been adopted by the Ninth Circuit. Therefore, the court concludes that this additional showing is not necessary under the substantial nexus test.

In sum, EPIC has sufficiently shown that a hydrologic connection exists between Bear Creek and the streams in question. However, EPIC has not shown that those streams are significant to the water quality of Bear Creek. EPIC must make this showing to establish a substantial nexus and meet the definition of navigable waters under the CWA.

#### 5. Without a Permit

The final element of a prima facie showing for violations of section 301 is that the

defendant discharged without an NPDES permit. PALCO admits that it did not have an NPDES permit at the time of the discharges documented by EPIC. JSUF at 25 (March 1, 2006). PALCO filed a NOI on July 12, 2005; the alleged discharges observed by EPIC occurred on various dates in March 2004 and March 2005. *See* Pl's Mot., at 43 (presenting a table of the thirteen discharges observed with dates of observation).

■ However, PALCO argues that some of the alleged discharges, including Location No. 9, occurred on property that is not PALCO's land.[12] Def's Opp'n, at 33. EPIC must prove that PALCO could have obtained a permit for discharges on land that PALCO does not own or control. EPIC has not met its burden with respect to this element to the extent that any of the locations belong to landowners other than PALCO. As to locations owned or controlled by PALCO, EPIC has made a sufficient showing on this element.

In sum, however, for the reasons stated above as to all of the required factors, EPIC has not made out a prima facie case under section 301.

#### B. *Section 402(p)*

■ EPIC alleges two different bases for violations of section 402(p). First, it argues that PALCO violated section 402(p) by failing to obtain a permit for discharges of storm water associated with industrial activities from March 8, 2004 to July 12, 2005 at each of seventeen discharge points. Second, it contends that PALCO violated section 402(p) for failure to obtain a permit for similar discharges during the period May 25, 1996 to March 8, 2004. For the first set of claims, EPIC asserts an indi-

---

**12.** While PALCO's papers and the related expert report submitted are not clear, the court assumes that PALCO does not own or otherwise control the land on which certain obser-

vations of alleged discharges occurred. *See* Def's Opp'n, at 33; Lozeau Dec., Ex. AA, Charles Rep. Ex. D at 1.

vidual violation for each of seventeen alleged discharges for each day between the time EPIC observed the discharge until PALCO obtained a permit, a total of 5,957 claimed violations. For the second set of claims, EPIC argues an individual violation for each day PALCO was without a permit. It counts backwards from, March 8, 2004, the day that EPIC first observed an alleged discharge on any of PALCO's locations, to May 25, 1996, the day the statute of limitations began to run on this action. Pl's Mot. at 7. This calculation produces a total of 2,633 violations, according to EPIC.

The parties disagree as to the requirements for section 402(p) liability in two respects.[13] First, EPIC contends that it need only prove discharge of storm water,

13. Section 402(p) of the CWA reads in its entirety:

(p) Municipal and industrial stormwater discharges.

(1) General rule. Prior to October 1, 1994, the Administrator or the State (in the case of a permit program approved under section 402 of this Act [this section] ) shall not require a permit under this section for discharges composed entirely of stormwater.

(2) Exceptions. Paragraph (1) shall not apply with respect to the following stormwater discharges:

(A) A discharge with respect to which a permit has been issued under this section before the date of the enactment of this subsection [enacted Feb. 4, 1987].

(B) A discharge associated with industrial activity.

(C) A discharge from a municipal separate storm sewer system serving a population of 250,000 or more.

(D) A discharge from a municipal separate storm sewer system serving a population of 100,000 or more but less than 250,000.

(E) A discharge for which the Administrator or the State, as the case may be, determines that the stormwater discharge contributes to a violation of a water quality standard or is a significant contributor of pollutants to waters of the United States.

(3) Permit requirements.

(A) Industrial discharges. Permits for discharges associated with industrial activity shall meet all applicable provisions of this section and section 301 [33 U.S.C. § 1311]

(B) Municipal discharge. Permits for discharges from municipal storm sewers—

(i) may be issued on a system- or jurisdiction-wide basis;

(ii) shall include a requirement to effectively prohibit non-stormwater discharges into the storm sewers; and

(iii) shall require controls to reduce the discharge of pollutants to the maximum extent practicable, including management practices, control techniques and system, design and engineering methods, and such other provisions as the Administrator or the State determines appropriate for the control of such pollutants.

(4) Permit application requirements.

(A) Industrial and large municipal discharges. Not later than 2 years after the date of the enactment of this subsection [enacted Feb. 4, 1987], the Administrator shall establish regulations setting forth the permit application requirements for stormwater discharges described in paragraphs (2)(B) and (2)(C). Applications for permits for such discharges shall be filed no later than 3 years after such date of enactment [enacted Feb. 4, 1987]. Not later than 4 years after such date of enactment [enacted Feb. 4, 1987], the Administrator or the State, as the case may be, shall issue or deny each such permit. Any such permit shall provide for compliance as expeditiously as practicable, but in no event later than 3 years after the date of issuance of such permit.

(B) Other municipal discharges. Not later than 4 years after the date of the enactment of this subsection [enacted Feb. 4, 1987], the Administrator shall establish regulations setting forth the permit application requirements for stormwater discharges described in paragraph (2)(D). Applications for permits for such discharges shall be filed no later than 5 years after such date of enactment [enacted Feb. 4, 1987]. Not later than 6 years after such date of enactment [enacted Feb. 4, 1987], the Administrator or the State, as the case may be, shall issue or deny each such permit. Any such permit shall provide for compliance as expeditiously as practicable, but in no event later than 3 years after the date of issuance of such permit.

(5) Studies. The Administrator, in consultation with the States, shall conduct a study for the purposes of—

without a pollutant, to establish PALCO's liability under section 402. Second, PALCO contends that failure to apply for a permit is not an element under section 402. Finally, the court considers whether EPIC can state a claim under section 402(p) for discharging without a permit.

First, the parties dispute whether section 402 liability may be imposed for the discharge of stormwater only or whether discharge of a pollutant is required. EPIC contends that section 402(p) regulates the discharge of stormwater associated with industrial activity, a term it construes loosely, and as such it may demonstrate a violation of section 402 by showing discharges of stormwater without the presence of pollutants. The court need not decide this issue because the evidence EPIC presents to establish violations of section 402(p) at the seventeen locations includes some evidence of sediment, a pollutant. At most of the locations, EPIC's experts measure sediment levels and turbidity. Even when EPIC's experts did not do so, they documented their observations of "muddy water" at Locations 15 and 17, which the court takes as an allegation of the presence of sediment. Def's Opp. at 39, 40–41. At Location 16, Mr. Bond observed "silts and sands" discharged onto the hillside. Lo-

zeau Dec., Ex. Q–8. Because EPIC has not provided evidence of discharge of stormwater without the presence of a pollutant, the court need not decide whether the presence of pollutants is required for section 402 liability.

PALCO argues that EPIC cannot maintain a cause of action for failure to apply for a permit under section 402(p). EPIC, in turn, contends that the elements of section 402 liability include failure to apply for an NPDES permit. However, EPIC provides no statutory or case law support for this element in its supplemental briefing nor in its moving papers other than the fact that section 402(p)(4) (A) sets out that "[a]pplications for permits for such discharges shall be filed no later than 3 years after such date of enactment [enacted Feb. 4, 1987]." 33 U.S.C. § 1342(p)(4)(A). The statutory text does not employ the language of duty, rather it proscribes a timeline for the filing of applications where appropriate. The Second Circuit addressed a similar argument in *Waterkeeper Alliance, Inc. v. United States EPA*, 399 F.3d 486, 505 (2d Cir. 2005). That case involved a challenge to an EPA rule requiring all Concentrated Animal Feeding Operations (CAFOs) to apply for an NPDES permit regardless of

(A) identifying those stormwater discharges or classes of stormwater discharges for which permits are not required pursuant to paragraphs (1) and (2) of this subsection;
(B) determining, to the maximum extent practicable, the nature and extent of pollutants in such discharges; and
(C) establishing procedures and methods to control stormwater discharges to the extent necessary to mitigate impacts on water quality.
Not later than October 1, 1988, the Administrator shall submit to Congress a report on the results of the study described in subparagraphs (A) and (B). Not later than October 1, 1989, the Administrator shall submit to Congress a report on the results of the study described in subparagraph (C).

(6) Regulations. Not later than October 1, 1993, the Administrator, in consultation with State and local officials, shall issue regulations (based on the results of the studies conducted under paragraph (5)) which designate stormwater discharges, other than those discharges described in paragraph (2), to be regulated to protect water quality and shall establish a comprehensive program to regulate such designated sources. The program shall, at a minimum, (A) establish priorities, (B) establish requirements for State stormwater management programs, and (C) establish expeditious deadlines. The program may include performance standards, guidelines, guidance, and management practices and treatment requirements, as appropriate.

whether they had in fact discharged any pollutants under the CWA. The court in strong language disavowed this interpretation as inconsistent with the text and purpose of the CWA. *Id.* at 506. "[I]n the absence of an actual addition of any pollutant to navigable waters from any point, there is no point source discharge, no statutory violation, no statutory obligation of point sources to comply with EPA regulations for point source discharges, and no statutory obligation of point sources to seek or obtain an NPDES permit in the first instance." *Id.* at 505. The court declines to adopt such a duty as an element of section 402 liability.

In order to establish a violation of section 402, EPIC would need to establish that PALCO had failed to comply with the terms of an NPDES permit. Section 402 sets out the permitting requirements for NPES permits. Section 402(h) affords a cause of action for noncompliance with a permit. *See Laidlaw,* 528 U.S. at 174, 120 S.Ct. 693. As noted above, it confers no independent cause of action other than that for noncompliance. The court has found no cases in which a plaintiff has maintained a separate cause of action under section 402 for discharges. Liability under the CWA for discharges is appropriately brought under section 301.

Therefore, the court concludes that plaintiff has failed to establish PALCO's liability under section 402.

CONCLUSION

For the foregoing reasons, the court hereby DENIES defendants' motion for summary judgment with respect to standing and DENIES plaintiff's motion for partial summary judgment on the issue of defendants' liability.

IT IS SO ORDERED.